MOORSHEAD, Appellant, v. UNITED RAILWAYS COMPANY et al., Respondents.

St. Louis Court of Appeals, May 22, 1906.

(Opinion by Goode, J.)

1. **STREET RAILWAYS:** Municipal Corporations: Authority to Lease. An ordinance of the city of St. Louis authorized several street railway lines, their successors and assigns, to lease their several properties, rights and franchises to a certain other corporation named; this was sufficient authority for the latter corporation to receive a valid lease from a purchaser of the several lines of street railway and is in conformity with section 20, article 12, of the Constitution.

2. ———: Contracts: Agency. Where one street railway company entered into a contract with another by which the latter acquired every franchise of the former with all its property, real, personal and mixed and all income derived from bonds and stocks, for which it agreed to pay the former company stated payments at regular intervals as fixed charges, to operate the railways, to keep the property in good repair, to pay floating indebtedness, interest on bonds, assessments, water rents, to apply certain portion of the earnings on betterments, to indemnify and save the former harmless from all costs and charges arising from the operation of the road, with a provision for re-entry and the taking possession of the property by the former in case the latter failed to keep its covenants and at the termination of the contract in forty years to restore the property to the former company, with no provision that the latter company should continue the business in the name, or for the benefit, of the former company, the contract was *not* one of agency whereby the latter company became the agent of the former and liable for its torts.

3. ———: ———: Partnership. And the contract, lacking the essential test of a partnership, an intention to constitute it such, was not a partnership.

4. ———: ———: Lease. In the absence of any facts to show that the contract was not executed in good faith, it must be construed to be a lease.

5. ———: Lessor and Lessee: Authority to Lease. Under section 1187, Revised Statutes of 1899, any street railroad company, on compliance with the conditions therein, is empowered to lease its property to another company.

6. ———: ———: Liability of Lessor for Lessee's Torts. In the absence of a statute authorizing the lease of a railway company's property, a lessor is answerable for the torts of the lessee of such property because there is no common law authority for leasing by railroad companies; where there is statutory authority authorizing a lease and making the lessor responsible for the lessee's torts, such lessor is responsible; but those rules do not apply to street railways in this State because our statute authorizes them to lease their property without a reservation of such liability on the part of the lessor; and while the lessor of such property is responsible for the performance of its charter duties, the Legislature may authorize it to transfer to another company by lease the performance of those duties where such transfer is made in good faith and where such performance is secured, as in this State, by making the leasing company financially responsible in its organization.

7. ———: ———: Public Policy: Statutory Policy. The policy of this State in relation to the leasing of street railway property is settled by statute and that policy must be determined by the

rule of statutory construction; the question of public policy is not involved in it.

8. ———: ———: **Statutory Construction.** The rule of statutory construction that statutes must be interpreted according to the meaning of the language used, makes it necessary to give the term "lease" as used in the statute authorizing street railways to lease their property, its ordinary legal meaning, there being nothing in the context repugnant to that meaning.

9. ———: ———: **Liability of Lessor for Torts of Lessee.** Under the provision of section 1187, authorizing street railroad companies "to sell, lease or dispose of by any other lawful contract" all their property, franchises including the right to be a corporation, with no provision making the lessor liable for any of the acts of the lessee, it was manifestly the intention of the Legislature to authorize a street railway company to lease its property and to authorize the lessee to operate the property without making the lessor liable for the torts of the lessee in operating the railroad, and the lessor is therefore not liable for injuries to a passenger caused by the negligence of the lessee.

10. ———: ———: ———. From the fact that the statutes of this State in certain instances, authorizing the lease of railways, reserve liability for torts of the lessee against the lessor, it is fair to presume that when no such reservation of liability was made in the act relating to street railways, the intention was the lessee alone should. be answerable for its torts.

### (Concurring Opinion by Nortoni, J.)

11. ———: ———: **Meaning of Term Lease.** The same principle applies in determining the liability of a lessor, a street railway company, with respect to the torts of its lessee as applies between citizens generally, arising out of the relation of landlord and tenant; the term "lease" as employed in the statute authorizing a street railway to lease its property must be construed under section 4160, Revised Statutes 1899, to be the plain and ordinary meaning usually applied to the term.

12. ———: ———: **Liability of Lessor for Torts of Lessee.** Under the provisions of section 1187, Revised Statutes 1899, where the power of a street railway company to lease is conferred without the reservation of any liability against the lessor, the lessor cannot be held liable for injuries done to passengers by the negligence of the lessee.

13. ———: ———: ———: **Statutory Construction.** The fact that the Legislature in dealing with railroads has provided that

Moorshead v. United Railways Co.

the lessor in certain cases, under section 1060, Revised Statutes 1899, shall be liable for the torts of the lessee, indicates by the omission of such reservation in the act authorizing the lease of street railways a legislative intent to relieve the lessor in the latter cases from such liability.

**(Dissenting Opinion by Bland, P. J.)**

14. ———: ———: **Operating Contract: Lease.** Where one street railway company "leased" to another for a term of forty years, for considerations named, all the railways of the former and all its right, title and interest in all its property with all franchises, reserving the right in the grantor to continue to be a corporation, and assigned all rights in regard to collecting tolls, assessed by the lessor, subject to the same legal restrictions as imposed on the lessor, and the lessee agreed to indemnity, save and keep harmless the lessor from all costs and expenses arising from the operation, the contract was not one of agency, making the lessee the agent of the lessor, nor was it a contract creating the relation of partnership between the two companies, but was a lease.

15. ———: ———: **Liability of Lessor for Lessee's Torts.** Where the statute of the State authorized a street railway company to lease its property, it thereby authorized it to discharge its duties through a lessee, but did not relieve it of the obligation to serve the public by operating the railroad nor of any of the consequences or liabilities which would attach to it if it operated the road itself.

16. ———: ———: ———: **Charter Obligation.** A street railway company is a quasi public corporation created for the purpose, and burdened with the duty of carrying passengers and it cannot shift to a lessee without legislative authority the obligation it owes a passenger and is liable if injuries are caused by the negligence of the lessee operating the leased property.

17. ———: ———: ———: ———: **Statutory Construction.** The use of the term lease in section 1187, Revised Statutes of 1899, authorizing street railways to lease their property does not divest the company leasing its property from its statutory duties imposed upon it because of its public character, in the absence of statutory exemption from such duties; and a lessor, a street railway company, should be held to a strict performance of the duties imposed upon it by law, among which is to carry passengers safely.

Appeal from St. Louis City Circuit Court.—*Hon. O'Neill Ryan,* Judge.

AFFIRMED AND CERTIFIED TO SUPREME COURT.

*R. P. & C. B. Williams* for appellant.

(1) A railroad corporation without the express consent and authorization of the lawmaking power of the State cannot make a lease of its property or franchises to another corporation, such a contract being *ultra vires* and void. As between the parties, such a contract is non-enforcible, and as to the public for torts committed, in the use of the leased property, the lessee is treated as the agent of the lessor, both being jointly liable. Railway v. Brown, 17 Wall. 450; Railway v. Railroad, 130 U. S. 1; Railroad v. Railroad, 118 U. S. 290-630; Thomas v. Railroad, 101 U. S. 71; Railroad v. Bridge Co., 131 U. S. 371; Hart v. Railroad, 209 Ill. 414; McCoy v. Railroad, 36 Mo. App. 445; Markey v. Railroad, 185 Mo. 348; 2 Elliott on Railroads, sec. 430. (2) Even though legislative consent and authorization be given to a railroad corporation to execute or to accept a lease, such legislative permission cannot have the effect of relieving the lessor from the performance of its duties and obligations to the public, but simply validates the lease as between the parties, and the lessor remains liable to the public for the negligent acts of the lessee, the same as before the lease, unless the enabling statute contains an express exemption from liability. Railroad v. Hart, 209 Ill. 414, 70 N. E. 654; Harden v. Railway 129 N. C. 354; Brown v. Railway, 131 N. C. 445; Logan v. Railway, 116 N. C. 940; Railway v. Crane, 113 U. S. 424 (28 L. Ed.) 1064; Braslin v. Somerville, 145 Mass. 64; Quested v. Railway, 127 Mass. 204; McCabe's Adm. v. Railway, 112 Ky. 861; Beach, Private Corporations, sec. 366; Chicago Union Traction Co. v. Stanford, 104 Ill. App. 99; Railway v. Meech, 163 Ill. 305; Railway v. Balkwill, 195 Ill. 535; Railway v. Doan, 195 Ill. 168;

119 App.—35

Smith v. Railway, 130 N. C. 344; Balsey v. Railroad, 119 Ill. 68, 8 N. E. 859; Tillet v. Railroad, 118 N. C. 1031; Chollette v. Railroad, (Neb.) 4 L. R. A. 135; Par v. Railroad, 43 S. C. 197, 49 Am. St. R. 826; Bower v. Railroad, 42 Iowa 546; Lee v. Railroad, 116 Cal. 97, 58 Am. St. R. 140; Bean v. Railroad, 63 Maine 295; Lakin v. Railroad, 13 Oregon 436; Nelson v. Railroad, 26 Vt. 721; Daniels v. Hart, 118 Mass. 534; Railroad v. Dunbar (20 Ill. 623), 71 Am. Dec. 296 (note); Harmon v. Railroad, 28 S. C. 401; Hawkins v. Railroad, 119 Ga. 159; Phelps v. Steamboat Co., 131 N. C. 12; Pierce v. Railroad, 124 N. C. 83; 5 Thomp. Corp., sec. 5884; Whitney v. Railroad, 44 Me. 362; Stearns v. Railroad, 46 Me. 95; Hart v. Railroad, 33 S. C. 427; Bank v. Railroad, 25 S. C. 216; Railroad v. Morris, 68 Texas 49; Cogswell v. Railroad, 5 Wash. 46; Munz v. Railroad (La.), 64 L. R. A. 222; Aycock v. Railroad, 89 N. C. 330; Benton v. Railroad, 122 N. C. 1007; Railway v. Ferguson, 9 Tex. Civ. App. 610; Railway v. Allen (Tex. Civ. App.), 39 S. W. 125; Railroad v. Ellett, 132 Ill. 660; 23 Am. & Eng. Enc. Law, p. 784, par. b; Railroad v. Owen (Texas Civil App.), 75 S. W. 579.    (3)    The doctrine of the liability of the lessor to the public for the lessee's use of the leased property, notwithstanding legislative authority to execute the lease, as stated above, has been impliedly held by the Courts of Appeal and the Supreme Court of this State.    McFarland v. Railway, 94 Mo. App. 336, 68 S. W. 105; Anderson v. Railway, 161 Mo. 411, 61 S. W. 874; Sinclair v. Railway, 70 Mo. App. 588.    (4)    The ordinances in evidence fail to show any express assent of the city of St. Louis to the making of the lease, without which the lease is void under the Constitution. Constitution of Mo., art. 12, sec. 20.    Authority of the Municipal Assembly under said ordinances to certain named street railway corporations, or their successors or assigns, to lease their property, does not confer upon the successors or assigns of such corporations the power to

execute a lease, and the fact that the United Railways Company was the purchaser of said railways, cannot be held to invest it with the same powers that were conferred upon said expressly named corporations. The principle of strict construction of said ordinances forbids the implication of such extension of power. Archer v. Terre Haute, 102 Ill. 493; Elliott on Railroads, sec. 433; Railroad v. Railroad, 81 Pa. St. 104; Singleton v. Railroad, 70 Ga. 464. (5) The instrument in question is not a lease, but it resembles more "a partnership; an operating contract," or a "trust arrangement." In either case the Transit Company would be held as the agent of the United Railways Company. The essential elements of a lease—a determinate estate given the lessee, and absolute and exclusive ownership in the lessee of the term —are wanting in this instrument. Galveston v. Davis, 4 Texas Civil App. 468; Driscoll v. Railroad, 65 Conn. 230; St. Joseph, etc., v. St. Louis, etc., 135 Mo. 173; Railroad v. Cox, 102 Fed. 825; Archer v. Terre Haute, 102 Ill. 493; United S. Rolling Stock v. Potter, 48 Iowa 56.

*George W. Easley* with *Boyle & Priest* for respondent.

(1) We can best serve the court by classifying the cases cited for appellant, and eliminating such as deal with other questions than the operation of the road. The first class of cases to be eliminated is that in which the lease was held invalid because there was no statutory authority to execute the same. All the cases cited in subdivision 1 of appellant's brief are cases of this character, where, for want of statutory authority to execute the lease, the same was held void. It is clear that such cases can have no application to the case at bar, because the statute cited in our statement authorizes the execution of the lease, so that cases of the character cited in subdivision 1 must be eliminated from our consideration of

this question. Many cases cited for appellants in subdivision 2 must also be eliminated, because there was no statutory authority for the execution of the lease. Chollette v. Railroad (Neb.), 4 L. R. A. 135; Munz v. Railroad (La.), 64 L. R. A. 222. (2) All that class of cases cited in subdivision 3 of appellant's brief must be eliminated from the consideration of this court, because the lessor is made liable by statute. Smith v. Railroad, 61 Mo. 17; Anderson v. Railroad, 161 Mo. 411, 61 S. W. 874; Maine v. Railroad, 18 Mo. App. 388; Brown v. Railroad, 27 Mo. App. 394; McCoy v. Railroad, 36 Mo. App. 445. Such cases as Quested v. Railroad, 127 Mass. 204, and Daniels v. Hart, 118 Mass. 534, must also be eliminated, because the very act authorizing the lease expressly provided that the lessor should remain liable for the acts of the lessee, notwithstanding the lease. There is nothing of that kind in the street car act of Missouri. (3) Even the Illinois courts have recently begun to distinguish between mere operation of the road and charter duties. Railroad v. Eickman, 47 Ill. App. 156. (4) Counsel also cites a line of Massachusetts cases, of which Quested v. Railroad, 127 Mass. 204, is a sample. An examination of all these cases will show that the act authorizing the lease expressly provided that it should not relieve the lessor from liability. The learned counsel likewise relies upon the case of Nelson v. Railroad, 26 Vt. 721. That case was decided by Judge Redfield, who, in the subsequent editions of his work upon Railroads, distinctly states that the effect of legislative consent was not met or decided in the Nelson case. 1 Redfield on Railways, p. 618, note; see, also Arrowsmith, v. Railroad, 57 Fed. Rep. 176. (5) The rule established in Missouri seems to follow the text-books. "A railway company cannot by a lease, without the consent of the statute, escape responsibility for the acts of a lessee and thus shift the burdens and responsibilities it took upon itself by accepting a charter at the hands of

the State or by organizing under the general law. Freeman v. Railroad, 28 Minn. 443; Nelson v. Railroad, 26 Vt. 717; Thomas v. Railroad, 101 U. S. 71; Railroad v. Wynans, 17 How. 30; Black v. Canal Co., 22 N. J. Eq. 130. But with such consent it may undoubtedly do so. Freeman v. Railroad, *supra;* Mahoney v. Railroad, 63 Maine 68." Brown v. Railroad, 27 Mo. App. 400. The following cases fully sustain the doctrines of the textbooks. Pinkerton v. Penn. Traction Co. (Sup. Ct. Pa.), 44 Atl. 284; Heron v. Railroad, 71 N. W. 706; Hayes v. Railroad, 74 Fed. 279; Carruthers v. Railroad, 54 Pac. 673; Arrowsmith v. Railroad, 57 Fed. 165; Mahoney v. Railroad, 63 Me. 68; Scziwak v. Railroad, 4 Pa. Dist. R. 339; Railroad v. Washington, 10 S. E. 927; Evans v. Railroad, 18 S. W. 493; Buckner v. Railroad, 18 South. 449; Lakin v. Railroad, 12 Or. 436, 57 Am. Rep. 25; Miller v. Railroad, 125 N. Y. 118; Gwathney v. Railroad, 12 Ohio St. 92; Fisher v. Railroad, 34 Hun 433; Railroad v. Mangum, 68 Tex. 342.

GOODE, J.—The petition alleges that plaintiff was hurt by the negligence of defendant's servants in suddenly and violently starting a street car on which she was a passenger and while she was walking in the aisle to a seat. The action was instituted against the St. Louis Transit Company and the United Railways Company and both are alleged to have owned and been engaged in operating the car and line of railway on which it was running. The answers filed by the two defendants were both general denials. Evidence was adduced tending to prove the plaintiff was injured in the manner alleged and that it resulted from the negligent conduct of the car's crew. It is conceded by the plaintiff that the evidence proved the car was operated by the Transit Company under and by virtue of a written instrument executed by the two companies and purporting to be a lease. The only evidence relied on to fasten liability for the accident on the United Railways Company was this

contract. The jury were instructed to return a verdict against both the defendants, if they found the issues for the plaintiff. A verdict against both having been returned, the court sustained motions filed by the United Railways Company for a new trial and in arrest, on grounds equivalent to an express ruling that it was not liable to the plaintiff. Similar motions filed by the Transit Company were overruled. The result was that plaintiff appealed from the order sustaining the motion of the United Railways Company, and the Transit Company appealed from the judgment against it, but afterwards dismissed its appeal. Two ordinances of the city of St. Louis were put in evidence, one of which is relied on as giving the city's consent to the leasing by the United Railways Company of the line on which plaintiff was hurt, to the Transit Company. The title and two paragraphs of that ordinance will be copied. The title is as follows:

"An ordinance for the greater convenience and further transportation of passengers on the railways of the Cass avenue and Fair Ground Railway Company, Citizens' Railway Company, Southwestern Railway Company, Southern Electric Railroad Company, St. Louis Railroad Company and Baden and St. Louis Railroad Company, respectively, and for that purpose authorizing change of motive power, the connection of railway tracks respectively, and the running of cars of one or more of said companies on the tracks of one or more of the other companies, and of such companies whose tracks may be intersected by the tracks of either of said companies, with authority to run ambulance, funeral, mail and express cars, also authorizing if found desirable for said purpose, the sale, conveyance or lease of rights, privileges, franchises and property of one or more of said companies, and of the companies whose tracks may be so intersected, to another of said companies or to the St. Louis Transit Company, its successors and assigns,

and the acquisition thereof with authority to hold, enjoy and operate the same for a period expiring with the term of the franchise of the Southern Electric Railroad Company, as provided in city ordinance number fourteen thousand, eight hundred and thirty-seven, and to regulate the speed of cars, and authorizing the Southwestern Railway Company to extend its tracks on Gravois avenue from its intersection with the Morganford road to Bates street, and there to connect with the tracks of the Southern Electric Railroad Company, and extending the time for the completion of its tracks from Grand avenue on Chippewa street and Gravois avenue to the Morganford-road, and the Southern Electric Railroad Company to extend its route on Longborough avenue, Gravois avenue and Bates street, and to operate the same."

The first and third sections of the ordinance read:

"Whereas, it will be to the great advantage of passengers to have the tracks of the Cass Avenue and Fair Grounds Railway Company, Citizens' Railway Company, Southwestern Railway Company, Southern Electric Railroad Company, St. Louis Railroad Company and Baden and St. Louis Railroad Company, respectively, connected, and the cars of said companies respectively, run on the track or tracks of others of said companies;

"Therefore, The St. Louis Railroad Company is hereby authorized to connect its tracks on Broadway with the tracks of the Citizens' Railway Company at Morgan street and Franklin avenue, and to connect its tracks on Broadway and Walnut street with the tracks of the Cass Avenue and Fair Grounds Railway Company, and its tracks at Broadway and Elm street with the tracks at that point, and to connect its tracks at or near Broadway and Keokuk street with the tracks of the Southern Electric Railroad Company; and authority is given to the Southwestern Railroad Company to connect

its tracks with the Southern Electric Railroad Company at Chippewa street and Jefferson avenue; and thereupon with the consent of the St. Louis Railroad Company and said Citizens' Railway Company, Cass Avenue and Fair Grounds Railway Company, Baden and St. Louis Railroad Company, Southern Electric Railroad Company and the Southwestern Railway Company, respectively, the cars of said companies respectively, may be run on each other of said companies' tracks respectively, and upon the tracks of any railway company with which any of the tracks of said companies may intersect, and may be agreed upon between them respectively, and with such companies whose tracks may be so intersected, and for that purpose authority is hereby given to make desirable curves and switches and connections therewith, and the cars shall be run at the same rate of speed on the tracks on which they may run as is now provided by ordinance for the running of cars thereon."

"Sec. .3. For the better effecting the purpose of this ordinance, the said Cass Avenue and Fair Grounds Railway Company, Citizens' Railway Company, Southwestern Railway Company, Southern Electric Railroad Company, St. Louis Railroad Company, Baden and St. Louis Railroad Company and any company whose tracks may be intersected by the tracks of any of said companies, and their successors and assigns, are hereby severally authorized to sell, convey, or lease, if found desirable, their property, rights, privileges and franchises now owned and held or herein granted, respectively, to any of the said companies named in this section, or to the St. Louis Transit Company, its successors and assigns, the said company and its successors and assigns so acquiring such property, rights, privileges and franchises, is hereby authorized to acquire, hold and enjoy the same during the term of this ordinance; provided, however, that if such acquisition is had, passengers shall be transported over the whole or any part of said rail-

roads or railways, in the city of St. Louis, so acquired on one continuous ride for one fare, and for that purpose transfers may be made at convenient points."

It was admitted on the trial that the United Railways Company (sometimes called herein the Railways Company) acquired by purchase all the railroad lines named in paragraph one of the ordinance, that two-thirds of the stockholders of the two corporations passed resolutions authorizing the lease and that the contract of lease was duly executed.

The contract recited that the United Railways Company and the St. Louis Transit Company were at the date of the instrument, corporations organized under the laws of the State of Missouri; that the former owned several lines of railway in the city and county of St. Louis and certain bonds and stocks described in a deed to the St. Louis Transit Company of date September 30, 1899; that the United Railways Company was willing to lease its railway lines, property and franchises, and all the income from its bonds and stocks to the Transit Company for a period beginning October 1, 1899, and ending April 1, 1939, and that the Transit Company was desirous of acquiring said lines and franchises by lease. The contract then proceeds to say: "Now, therefore, this agreement witnesseth, that United Railways for and in consideration of the convenants and agreement hereinafter contained on the part of the Transit Company, to be by it made, kept and performed, has granted, demised and leased, and by these presents does grant, demise and lease unto Transit Company all the railways," etc.

The subsequent portion of the instrument may be summarized as follows: The Transit Company acquired from October 1, 1899 to April 1, 1939—

First. All the railroads constructed, owned or operated by the United Railways Company or that it might thereafter construct, own or operate.

Second. All the property real, personal or mixed held by the United Railways as owner or otherwise or that it might acquire.

Third. All the income derived from any bonds or stocks owned by the United Railways or which it might acquire.

Fourth. All franchises belonging to the United Railways or which it might acquire, except the franchise to be a corporation and any other right or franchise necessary to preserve its corporate existence and organization.

Fifth. Exclusive right to use, manage and operate the railways and fix and collect tolls, but not at higher rates than United Railways was empowered to fix them.

Sixth. All money of the United Railways on hands at the date of the lease or received by it afterwards from any source (par. 9).

The Transit Company as consideration agrees—

First. To pay a net annual rental of five dollars per share on all the preferred stock of the United Railways then outstanding or that might be issued with the consent of the Transit Company; said rental to be paid quarterly on the 10th days of January, April, July and October of each year.

Second. At its own cost and expense and without deduction from the rent (a) to maintain, operate, work, use and run and keep in public use the demised railways in the same manner the lessor, the United Railways, was required to do; (b) keep the demised railways and their property in good repair, working order and condition and supplied with rolling stock and equipment so as to develop the business; (c) make any repairs and replacements on the demised property, and all additions to and improvements thereon, and provide such new and additional rolling stock from time to time as might be necessary for the proper operation and use of the property.

In payment for the additions, acquisition, better-ments and improvements made by the Transit Company to the property demised, the contract provided that the United Railways, when requested by the Transit Company or on its order, should deliver to the latter, bonds of the first general mortgage bonds secured on the rented railway at par and authorized to be issued for improvements; or, in lieu of said bonds, any unissued, preferred or common stock of the United Railways at the option of the Transit Company.

Third. In addition to the regular rental, the Transit Company agreed to pay the United Railways Company $1,000 a year for the purpose of defraying the expenses of maintaining the corporate existence of the United Railways and companies connected with it.

Fourth. Pay all the floating debts of the United Railways Company.

Fifth. Pay all tolls, assessments and water rents assessed against the property of all kinds of the United Railways Company.

Sixth. Pay the interest on the bonds thereon issued by the United Railways and the subordinate companies whose lines had been acquired by the United Railways Company and included in the lease to the Transit Company. Seventeen issues of bonds aggregating about $35,-788,000 are enumerated under this item of the consideration paid by the Transit Company for the lease.

Seventh. Keep the demised property insured at its own expense.

Eighth. Apply all net surplus earnings above six per cent annual dividends on its capital stock, either to the extension and betterment of the leased lines of the railway, or the redemption of the mortgage indebtedness of the leased property.

Ninth. To apply all money not needed for current liabilities or interest turned over to it by the United Railways, or on hand at the date of the lease, or re-

ceived by the United Railways thereafter, from the rent of useless property, to 'the improvement of the demised property.

A.  The Transit Company agreed to "indemnify, save and keep harmless the United Railways during the continuance of the lease from all costs, charges and expenses arising from the management and operation of said railways and all matters incident thereto." (Par. 1 of lease.)

B.  The United Railways agreed in effect to maintain its corporate existence, and when requested by Transit Company, put in force and exercise each and every right it owned or might acquire, and do every lawful corporate act necessary or proper to enable the Transit Company to avail itself of the franchises and property demised; and the Transit Company agreed to indemnify the Railways Company "against all expenses, loss, damage or liability for such exercise of corporate power or performance of corporate acts."

C.  The right of re-entry on the demised property was restored to the United Railways in the event the Transit Company failed to keep any of its covenants. It was provided that a re-entry for non-performance of covenants by the Transit Company should not prejudice the right of the United Railways to recover damages for 'the default.

D.  All cars, machinery, tools, appliances and other personal property belonging to United Railways should be turned over to Transit Company as soon as the lease took effect, and, in case of the termination of the demise, should be restored to the Transit Company, or in lieu thereof its value paid; the value to be found by an appraisement.

E.  On termination of the contract for breach of covenant, all betterments previously made by the Transit Company became the property of the United Railways.

F.  The Transit Company agreed to keep true ac-

counts of its receipts and disbursements, and that its books should be open to inspection by the United Railways.

G. Differences arising between the two parties regarding the meaning of any part of the lease, and other matters, were to be settled by arbitration.

That the United Railways Company is liable in damages to plaintiff notwithstanding the contract between it and the Transit Company, and the operation of the line and car on which she was hurt by the Transit Company pursuant to the contract, is maintained on three grounds; first, that if the contract is a lease, it is inoperative for lack of consent to the leasing by the city of St. Louis; second, that the contract is not a lease, but in legal effect is an agreemnt by the Transit Company to operate the railway lines it was put in possession of for the United Railways Company as the latter's agent, or else is a partnership agreement between the two companies; third, that if a valid lease, the United Railways Company as lessor remained liable for all torts of the Transit Company as lessee, because the statute allowing such leases by street railway companies contains no clause expressly exempting a leasing company from liability for the acts of the lessee.

The Constitution of the State forbids the enactment of a statute granting the right to construct and operate a street railway in any city without first obtaining the consent of the local authorities, and forbids too the transfer of a right or franchise to occupy a street with a street railroad without first obtaining such consent. [Const., art. 12, sec. 20.] The argument for the plaintiff is that the ordinance relied on as giving the consent of the city of St. Louis to the lease in question did not, in truth, give consent, because it only authorized the railway companies named in it to lease the lines of railway named, including the one on which plaintiff was hurt, and did not authorize a lease of the properties

by the United Railways Company, which was not named. It will be seen that the third section of the city ordinance, which we have quoted, expressly authorized the lease of the line on which plaintiff was hurt to the St. Louis Transit Company by its original owner, one of the companies named; which one is not disclosed by the evidence. It is admitted that the United Railways Company acquired by purchase all the lines of railway owned and operated by all the railway companies mentioned in the ordinance. There is no sound reason for saying that the United Railways Company, though the owner of the line pursuant to a valid purchase, could not lease it to the Transit Company just as the original company might, pursuant to the permission given to the latter by the city. The city had authorized the Transit Company to acquire it by lease, and municipal interests could not be helped by permitting the original owner to grant the lease, and refusing to permit a lawful purchaser to do so, when the lessee, in either event would be the same. The decisive fact bearing on this point is not, as plaintiff's counsel insist, that the United Railways Company received no authority to lease the line of railway on which plaintiff was hurt to the Transit Company. It is that the latter was authorized to take a lease of it. Hence, the argument that the words of the ordinance purporting to empower the street railway companies named and "their successor and assigns," to lease their several railway lines, did not operate and empower the United Railways Company as purchaser of said railway lines to lease them, is not relevant to the proposition that the lease is void for lack of the city's consent. The case of the Oregon Railroad Company v. Oregonian Railroad Company, 130 U. S. 1, decides that the words "successors and assigns," as used in various State statutes in connection with specific grants of power to railway companies, did not necessarily import that the Legislature

intended to empower railway companies to lease or sell their entire property. There was no Oregon statute undertaking in express terms to empower a railway company to assign or lease all its property; but an attempt was made to deduce a sweeping power of that kind from general statutes granting authority to do many things to railway companies, "their successors and assigns." These statutes were said to show the Legislature intended that any power or franchise granted to a railway company in the general laws under which all railway companies must be incorporated in Oregon, might be exercised and enjoyed by an assignee or successor of the original company; that, hence, the statutes, by implication, authorized a company to assign or lease its entire property. It is plain that this argument was far-fetched, and in conflict with the rule universally. enforced that a lease or assignment of all its franchises and assets by a corporation created for public purposes and charged with public duties, thereby disabling it to serve the public, is void unless authorized by statute. [Thomas v. Railroad, 101 U. S. 71; Pennsylvania R. R. v. Railroad, 118 U. S. 290, 309; Beman v. Rufford, 1 Sim. (n. s.) 550; Great Northern Ry. Co. v. Ry. Co., 9 Hare 305; Winch v. Railroad, 5 DeG. & S. 362.] The proposition decided in Oregon Railway Company v. Oregonian Ry. Co. gives no support to the proposition that the lease by the United Railways Company to the Transit Company is void because not assented to by the city, for the city did assent, and in connection with its assent attended to the detail of selecting the lessees which might take; one of them being the Transit Company, which did take. Were it necessary, other cogent reasons could be given against the position that the lease contract under examination is void because in conflict with the constitutional provision we have cited, but the foregoing are deemed sufficient.

Is the agreement between the companies a lease or

a contract for the operation of the United Railways Company's lines by the Transit Company as the agent of the former company and for its benefit? Did it constitute a partnership? We will first deal with the legal effect of the instrument as ascertained from its terms, and not with a possible ulterior motive or purpose which may have prompted its execution. If the agreement was not entered into in good faith and for the purpose declared, but to defeat the creditors of the United Railways Company, or enable its properties and franchises to be held and used for its benefit in a manner that would screen it from judgments and relieve it of responsibility, no doubt the United Railways Company would be held liable without regard to the contract. But such an issue would be for the jury unless the instrument itself, or facts in evidence, showed the truth beyond dispute. No fact aliunde to cast suspicion on the transaction was shown; and if the agreement is to be ignored on the ground that it was not entered into in good faith, the ground must be established by the contents of the instrument. This matter will be recurred to again. The question to be settled first is as to the legal nature of the agreement as written. It is apparent that the contract is more than an operating one; for it transferred to the Transit Company other property than the railways and their appurtenances belonging to the United Railways Company, and required the Transit Company to perform other acts besides operating the railway lines. The Transit Company acquired every franchise held by the United Railways Company except the franchise to be a corporation; all the latter company's property, real, personal and mixed; all the income derived from its bonds and stocks; the money it had on hand at the date of the agreement, and what it might receive afterwards by the sale of unusable property. Besides operating the railways, the Transit Company was bound to do various acts, such

Moorshead v. United Railways Co.

as keeping them in repair, making extensions and improvements and meeting the interests on bonded obligations. Therefore, it is obvious that if the agreement between the two companies was one for the operation of the railways, that term in the agreement, though perhaps the principal and most important one, was mingled with others of much importance. We can think of only three conditions on which the Transit Company could operate the United Railways Company's lines for the benefit of the latter. These are: first, operate them for absolutely no reward and as a mere gratuity to the United Railways Company; second, for compensation either in the form of a regular payment by the United Railways Company for the service or for a percentage of the earnings; third, on a partnership arrangement between the two companies. The agreement certainly did not contemplate that the Transit Company should operate the railways for nothing, nor was it allowed a fixed stipend or a percentage of the receipts in payment for its services. On the contrary, instead of being paid to operate the line, it agreed to pay the United Railways Company for the possession and use of the property during a stated period, payments to be made at regular intervals and bearing all the characters of a fixed rent charge. The agreement did not provide that the Transit Company should conduct the business in the name of or for the benefit of the United Railways Company, except in so far as the latter company was benefited by the consideration to be rendered by the Transit Company. It would be a very forced construction for us to torture the agreement by which the Transit Company was to yield fixed sums at regular intervals for the use of the property, into a contract of agency which made the United Railways Company principal and the Transit Company agent. All the elements of such a relationship are absent.

119 App.—36

Neither did the contract make the two companies partners, either between themselves, or as to third parties. A division of the profits of a business is not alone sufficient to constitute a partnership. The essential test is whether the parties asserted to be in partnership intended to establish that relation. [McDonald v. Matney, 82 Mo. 358; Mackie v. Mott, 146 Mo. 230.] Manifestly the two defendant companies had no thought of becoming partners; and as they did not hold themselves out to the world as such, there is no ground for holding they were. Therefore, we find that neither the relation of principal and agent nor of partnership can be applied with propriety to the contract.

Does the contract possess the elements of a lease? In this connection, it is proper to remark in the first place that goods, chattels and franchises may be leased as well as lands and tenements. [1 Platt, Leases, p. 24; 1 Wood, L. & T. (2 Ed.), sec. 202; 1 McAdam, L. & T. (2 Ed.), p. 258; 1 Taylor, L. & T. (9 Ed.), secs. 17 and 18.] The statutes of the State gave the United Railways Company the right to lease its franchises, railway lines and every other property, and by the same statute the Transit Company had the right to acquire every character of property belonging to the United Railways Company, including its franchises. [R. S. 1899, p. 393, sec. 1187.] We need not be troubled about the power of the two companies to enter into a lease covering all the properties mentioned in the instrument. The contract in question divested the United Railways Company of the possession and use of the properties during the period named (40 years) in consideration of a specific rent to be paid by the Transit Company, and other duties, in the nature of rent, to be performed by the latter; provided further, for the reversion of the property to the grantor, the United Railways Company, at the end of the term, and for re-entry if the Transit Company defaulted in the performance of its covenants dur-

ing the term. Those ingredients in the agreement suffice to constitute a lease. [1 McAdam L. & T., sec. 47, p. 127.] The contract on its face shows it was intended to be a lease and contains elements essential to constitute one. Therefore, there is no reason for hesitating to pronounce it a lease in legal effect and only to be impeached by facts showing it was not executed in good faith. Documents of like tenor have been before courts for construction several times and they were treated as leases. [Mayor v. Railway, 113 N. Y. 311; Miller v. Ry. Co., 125 N. Y. 118; Driscoll v. R. R., 65 Conn. 230; Terre Haute, etc., R. R. v. Cox, 102 Fed. 825.] In fact, most of the cases relied on by the plaintiff accept such contracts as leases; though for different reasons the lessors were held responsible to third parties for torts of the lessees. We are cited to the case of St. Jos., etc., R. R. v. St. Louis, etc., R. R. Co., 135 Mo. 173, 36 S. W. 602, as construing a contract like the one under review to be an agreement by a nominal lessee to operate a railway for the benefit of a nominal lessor, and, hence, in legal effect, not a lease but an operating agreement. But in that case, the terms of the instrument construed were quite different from those of the instrument before us. The decision of the court that it was a mere operating contract, was rested principally upon the fact of there being no stipulation for rent to be paid for the use of the property which was the subject-matter of the contract. In that case the Iron Mountain Railway Company, which was alleged to be a lessee of the lines of railway owned by the Wabash Railway Company, was obligated by the supposed lease to pay nothing in the way of rent except what might be earned by the operation of the roads. That is to say, the Iron Mountain Company simply took over the roads to operate and apply the earnings for the benefit of the Wabash Company. The Iron Mountain Company did not assume any individual liability of any kind in consideration of the supposed lease, nor bind

itself or its assets for any rent. It was for this fact that the contract between the two companies was held not to be a lease but an operating agreement. The opinion says:

"After a careful consideration of all its terms and stipulations, we are constrained to hold that it is not [i. e., a lease]. Its use of the words 'demise' and 'lease' cannot be held to be controlling. For want of a better definition it may be styled an operating contract, under the stipulations of which the Wabash retains all the substantial and beneficial interest in its several railroads and leased lines and in which the Iron Mountain railroad, under the power of attorney therein granted, assumes to operate the Wabash system, collect the tolls and freights, and disburse them for the sole use and benefit of the Wabash, subject at all times to the supervision of the board of directors of the Wabash as to its management and the right to inspect its books and the accounts of the earnings and disbursements.

"It will be observed that the Iron Mountain nowhere in said contract binds itself to pay the Wabash a certain rent unconditionally out of its own moneys and revenues. It merely undertakes that out of the earnings of the Wabash it will, so far as they will suffice, pay the fixed charges which the Wabash had already assumed, and if there is any surplus, to pay this over as directed by the board of directors of the Wabash. Under no circumstances are the earnings of the Wabash system or any part thereof to become the property of the Iron Mountain. All idea of individual liability of the Iron Mountain over and beyond the earnings of the Wabash for any of the obligations assumed is carefully and studiously excluded. There is no right on the part of the Wabash to a certain profit issuing periodically out of its properties as rent reserved.

"Instead of passing to the Iron Mountain a definite determinate estate of which it should be the absolute owner, it seems to us that the true effect of the whole

instrument was to leave the beneficial estate in the
Wabash and to constitute the Iron Mountain its agent
to manage and operate the road subject to the super-
vision of the Wabash and with the right of the Wabash
to know at all times that the earnings and receipts were
being disbursed for its use and benefit. While it was
a perfectly valid contract, it is a misnomer to call it
a lease or a sublease. [State ex rel. v. Schweickardt,
109 Mo. 496, 19 S. W. 47; Anglade v. St. Avit, 67 Mo.
434.]

"To transform this carefully guarded undertaking
merely to operate the road for the Wabash and account
to it for all the earnings and disburse them for its sole
use, into the unconditional and absolute liability as-
sumed by the Wabash in the lease from plaintiff to it
would certainly be subversive of the clear intention of
the Wabash and the Iron Mountain, and as already said,
this ought never to be done unless the established rules
of law will permit no other alternative."

By the contract before us the Transit Company's
liability for rent was not confined to the earnings of the
leased property. The Transit Company was a corpora-
tion with a capital stock running into the millions, and
its property was all subject to the obligation of its con-
tract with the United Railways Company to pay the vari-
ous charges and items of rent enumerated in the lease.

But it is insisted that paragraph 9 of the lease
bound the United Railways Company to turn over to
the Transit Company any money received by the former
from any source and, therefore, whatever rent the
Transit Company paid would be repaid to it; thus show-
ing there was no real consideration for the lease. One
item of rent is to be used to maintain the corporate
existence of the United Railways Company. Another
item, to be paid quarterly, is in the nature of a dividend
on the preferred stock of the Railways Company. We
hardly think the ninth paragraph intends that those cash

items of rent, which are to be paid to the Railways Company, must be returned by it to the Transit Company; but that the fair interpretation of the lease, taking into consideration all its terms with reference to this point, is that it aimed to transfer all the lessor's assets of every kind for an agreed rental. The Transit Company became entitled to all the assets of the Railways Company, including cash on hand, or that might come to it from the sale of property or other sources *except the rent,* which was the consideration to be paid for the transfer to and use by the lessee of the assets. The purpose of paragraph 9 seems to be to bind the Transit Company to use the cash received from the Railways Company in keeping the leased property in good repair. However, we are not called on to construe the ninth paragraph as to this question; because no one will contend that its language bound the Railways Company to reimburse the Transit Company for money paid by the latter as rent; not to the Railways Company, but to third persons on the obligations of the Railways Company. Now the Transit Company as lessee, agreed to pay all the floating debts of the Railways Company (par. 4), all its taxes, assessments and water rents (par. 5), the interest on the various issues of bonds secured on the different lines of railway (par. 6), and the insurance premiums on the property (par. 7). These chief items of the rent, running annually no doubt into many thousands of dollars, the lessee was bound to pay to third parties and not to the lessor, and there is nothing in paragraph nine, or any other part of the lease, which bound the lessor to reimburse the lessee for the amount thus paid. And, as said, the Transit Company was bound to pay these and the other items of rent even though the operation of the railways failed to earn enough money to meet the obligations. This contract is, therefore, radically different from the one construed in St. Jos., etc., R. R. v. Iron

Mt. R. R. Co., supra, and presents the essential elements of a lease.

The proposition next to be considered is, conceding that the contract was a lease, did the United Railways Company nevertheless remain responsible for injuries to a passenger resulting from the negligence of the Transit Company? In other words, is a leasing railway company so far liable for the torts of the lessee, that it must answer in damages for a tortious injury to the passenger? This question is one on which there is a great diversity of judicial opinion; but it is proper to state, as a circumstance bearing on the weight of authority, that in most of the cases affirming the liability of the lessor, there were dissents. I think the preponderance of authority, and the great preponderance of reason, are against the liability of the lessor in such cases. I think, too, that as a rule of law, the doctrine that the lessor is liable, is at war with the general rules and principles governing the liability of lessors for the acts of their lessees and the settled canons of statutory construction. As the statutes of this State give a street railway company, power to lease all of its property to another street railway company, there was direct statutory authority for the lease in dispute; and only those adjudications are exact precedents wherein statutory authority for the controverted lease existed. The particular statute authorizing such leases appears in the Revised Statutes of 1899 as a new section (1187). It is said not to have gone into force until November 1, 1899, and too late to confer authority for the contract we are dealing with, which was dated September 30, 1899, and took effect on October first, or the next day. But the statute was enacted with an emergency clause and approved June 19, 1899, prior to the contract in question. It is further said that the enactment only conferred the power to lease on corporations formed under the act and that both the United

Railways Company and the Transit Company were incorporated under prior statutes. But by section 15 of the act, any street railroad company theretofore organized under any general or special law of the State was granted all the powers, benefits and privileges of the act if it would file in the office of the Secretary of State, a resolution of its board of directors, accepting the provisions of the act and paying into the state treasury the fees required by section 13. The present record does not show whether or not the United Railways Company or the Transit Company complied with section 15; but in considering this point it is to be remembered that the United Railways Company did not introduce in evidence the contract with the Transit Company as matter of defense, and hence was not bound to show affirmatively it had power to execute the contract, as would have been incumbent on it, had it sought to evade liability by proving the lease. The instrument was introduced by the plaintiff to fasten liability on the United Railways Company, and there was no contention that the said company was without power to execute it because of failure to take advantage of the act of July 19, 1899, in the manner provided in section 13. The plaintiff relied on an instrument which she contended the United Railways Company had executed to prove said company was liable to her on several grounds; none of which was lack of statutory power to make a lease. Hence, it ought to be presumed, in the absence of proof to the contrary, that the two companies which were parties to the alleged lease, or at least the United Railways Company, had complied with the requirement of the statute authorizing street railway leases and had become entitled to the benefits and powers conferred on complying companies.

Cases affirming the liability of a leasing railway company for torts of the lessee, should be classified with reference to the existence of such a statute when the lease was executed. All courts agree that in the ab-

sence of a statute, a lease of its property and franchises
by a railway company, does not relieve it of its public
duties and responsibilities, and that the lessor remains
liable for the torts of the lessee. In other words, there
is no common-law authority for such leasing by railroad
companies; at least in so far as the contract impairs
the right of the public to hold the lessor answerable for
the proper discharge of the duties it assumed in con-
sideration of the powers granted to it by the sovereignty.
[Railway Co. v. Brown, 17 Wall. 445; Thomas v. R. R.,
101 U. S. 71; Chollette v. Id., 26 Neb. 159, 4 L. R. A.
135; Muntz v. Id., 64 L. R. A. (La.) 222.]

Before going into a discussion of the question on
principle, it is well to classify the adjudications, so that
those directly in point may be studied more readily, and
those wherein the proposition affirmed is not identical
with the one involved here, may have attached to them
the value they merit as containing the lucubrations of
judges on the general question and not treated as pre-
cedents on the exact question before us. When the lease
is authorized by statute, the leasing company, of course,
remains liable for the acts of the lessee if the statute
says it shall. [Smith v. R. R., 61 Mo. 17; Markey v.
R. R., 185 Mo. 348, 84 S. W. 61; Main v. Id., 18 Mo. App.
388; Brown v. Id., 27 Mo. App. 396; McCoy v. Id., 36
Mo. App. 445; Quested v. R. R., 127 Mass. 204; Daniels
v. Hart, Treas., 118 Mass. 543; Bower v. R. R., 42 Iowa
546; Whitney v. R. R., 44 Maine 362; Stearns v. R. R.,
46 Maine 95.] When the statute authorizes the leasing,
but says nothing as to whether the lessor shall remain
liable, a few courts hold that nevertheless the lessor is
liable as fully as the lessee itself would be, for the lat-
ter's tortious acts; and in pursuance of this extreme
view, these courts have held the leasing company liable
for negligent injuries inflicted by the lessee on its own
servants. [Chicago, etc., R. R. v. Hart, 209 Ill. 414;
Logan v. Id., 116 N. C. 940; Harden v. Id., 129 N. C.

254; Singleton v. Id., 70 Ga. 464; Bank v. Id., 25 S. C. 216; Hart v. Id., 33 S. C. 427.] In the case last cited the court went so far as to hold the lessor liable in punitive damages for the wrongful conduct of the lessee. The doctrine of other tribunals is that the leasing company remains liable to third persons for an injury received because of the improper construction or bad repair of the roadbed, station-houses, or other real property, on the ground that it was the peremptory duty of the lessor to maintain its properties in good condition for the use of the general public, including as part of the public the servants of the leasing company. [Lee v. R. R., 116 Cal. 97, 58 Am. St. Rep. 140.] In certain cases which maintain the doctrine that the lessor is not exonerated by a statutory lease from responsibility for the wrong performance by the lessee of any charter power or duty, it is held that the safe operation of cars and trains on which passengers are carried is a charter duty. [Railway Co. v. Colberson, 72 Texas 375.] We have found no Missouri statute, relating either to the chartering of companies or to their regulation, which undertakes to impose on street car companies by special legislative enactment, the duty of careful operation of cars for the security of passengers, though such companies are under a common-law duty of that sort. There are cases wherein the general principle that the leasing company remains responsible for the proper performance of its charter duties is adhered to, but the operation of trains and cars is declared not to be one of those duties. [Mahoney v. R. R., 63 Maine 68.] And in a note to Ohio, etc., R. R. v. Dunbar, 71 Am. Dec. 291, on page 297, it is said that a case holding the contrary does not accord with sound principle or authority. Other decisions repudiate these various distinctions as of no importance and ground the non-liability of the lessor on the grant of statutory power to make a lease; holding that this imports a lease with all the usual incidents and conse-

quences of that sort of a contract; one of which is that if the property is in safe and good condition when turned over to the lessee, the lessor is not responsible for subsequent injuries arising from its bad repair. [Fisher v. R. R., 34 Hun 433; Miller v. Id., 125 N. Y. 118.]

The foregoing cases may be classified, too, with reference to the principles on which they hold the leasing company responsible. Some courts profess to do this because public policy requires it, but disagree as to what particular public policy is to be subserved by the rule. Some ground the responsibility, as we have seen, on the fact that a railway company is an artificial person, deriving its powers from the sovereignty and in consideration of those powers, agreeing to perform certain duties for the sovereignty; hence should be held strictly acountable for their proper performance. Other cases declare that charter duties cannot be transferred and that it is a charter duty to carry passengers safely. Others that neither charter nor common-law duties can be transferred to a lessee so as to shift responsibility from the lessor; and that if the safe carriage of passengers is not a charter duty of the leasing company, it is at least a common-law duty, for the due performance of which the company that owns the railway is answerable.

Much stress is laid in some decisions on the supposed fact that if one railway company is permitted to lease its property to another, and thereby relieve itself from liability for the lessee's torts, leases may be made to irresponsible companies and the public left remediless. [Harden v. R. R., 129 N. C. 354.] There is one case—perhaps there may be others—which held the lessor responsible, apparently, on the ground that the lease did not transfer every franchise possessed by the lessor. [Braslin v. Somerville, 145 Mass. 64.] Still other cases hold the lessor responsible because, by the terms of the lease, it retains control of the management and opera-

tion of the leased property. [Driscoll v. R. R., 65 Conn. 230.]

It will be seen from the foregoing analysis that there is a wide divergence of opinion among courts holding the leasing railway company liable for the misfeasance of the lessee, both as to the extent of the liability (i. e., what instances of tortious conduct it covers) and the principles on which it is founded. A more direct reference to some of the cases may aid in elucidating the doctrines held and the sources whence they are derived. The Illinois cases run back to Ohio, etc., R. R. v. Dunbar, 20 Ill. 623, in which a leasing railway company was held answerable for breach of a contract by the lessee to carry freight. The point came up on demurrer to a plea of the lease by way of defense. No statute authorizing such a lease was in force at the time and the contract was held to be *ultra vires*. In later cases, after such a lease had been authorizd by statute, the Supreme Court of Illinois founded the liability of the lessor at first, on the theory that the lessee was its agent for the operation of the railway. [West v. R. R., 63 Ill. 545.] Afterwards this theory was discarded as unsound and the notion adopted that public policy forbade the leasing; because an insolvent lessee could be selected and all responsibility to the public evaded by the company to whom the State had granted franchises. [Chicago, etc., R. R. v. Hart, 209 Ill. 414.] The North Carolina cases are traceable to Aycock v. R. R., 89 N. C. 321, wherein a company which had permitted another company to run trains over its track was made to pay for damage done by fire communicated to adjacent farms, from rubbish permitted to accumulate on the right of way and ignite from sparks from an engine having no spark arrester. There was no lease and it did not appear that the defendant was not actually operating trains on its road. [See dissenting opinion in Harden v. R. R., 129 N. C. 354.] The Massachusetts case of Braslin v. R. R. Co., supra, lays

stress on the facts that only a portion of the railroad of the lessor company was leased; that said company was not going out of business and that indemnity was taken by it for the acts of the lessee, thereby showing that both parties understood defendant was not to be released by the contract from the discharge of its public duties. The Georgia cases begin with Singleton v. R. R., 70 Ga. 464, in which the defendant permitted its lessee to do business in its name, and in its name sell plaintiff the ticket on which he was traveling when hurt by the negligence of the lessee. It is apparent that though this was a case of leasing, the defendant lessor was responsible because it had permitted the lessee to hold it out as the principal in making contracts with the public and particularly with the plaintiff. In the Kentucky case of M'Cabe's Admr. v. R. R., 112 Ky. 861, we gather from the opinion that the Constitution of the State retained the liability to the public of the original company in the event of a lease or other transfer of its properties. In Muntz v. R. R., 64 L. R. A. (La.) 222, the opinion leaves one in doubt as to whether the lessor was held responsible because there was no legislative authority for the lease, or because all the franchises and property of the leasing company were not transferred, or from motives of public policy: In the Driscoll case (65 Conn. 230) the lessee agreed to indemnify the lessor, not only against costs, charges and expenses in the management of the leased property, as was done in the case at bar, but also against damages incurred in the operating of the property; and moreover it was agreed that the superintendent of the lessee, who was given power to hire employees, must be satisfactory to the lessor. Two judges dissented in that case. The majority opinion said the sole question was whether or not the defendant (lessor) had transferred the property to the lessee. In Lee v. R. R., 116 Cal. 97, a brakeman was hurt because of bad rails and roadbed. The Constitution of the State con-

tained a clause inhibiting the release of the property of a lessor from liability for damages incurred in the construction and operation of the road; but the case was decided against the defendant on the ground that, in the absence of an express statutory exemption, it remained liable, notwithstanding the lease, for the proper construction of the road, station-houses, etc. The opinion approves the doctrine of St. Louis, etc., R. R. v. Curl, 28 Kan. 622, which holds a leasing company liable for the omission of a duty in the construction of the road, but exonerates it from responsibility for torts in the handling of trains and the management of the road. The Kansas opinion was prepared by Justice Brewer, now of the Supreme Court of the United States, and indorsed the New York decisions concerning the liability of lessors for injuries due to defects in leased property, citing Scords v. Edgar, 59 N. Y. 28, and Ditchett v. R. R., 67 N. Y. 425. In R. R. Co. v. Morris, 68 Tex. 49, there was no statutory authority for the lease. The South Carolina cases most strongly support the plaintiff's position; whereas the Massachusetts cases can hardly be said to lend it any support. Opinions holding the lessor liable for the torts of the lessee, when the leasing is authorized by statute, leave the impression that the courts lay hold of various general rules of corporation law, having very remote bearing on the immediate question, in order to enforce what the deciding tribunal happens to think would be a salutary rule. Much stress is laid on the fact that the corporation is an artificial, instead of a natural, person and derives its powers from the State. How this dogma can restrict the right of a railway company to lease its property when the statute gives the right in unqualified terms, is not easy to perceive. The proposition that a railway company is bound to perform all its charter duties, and all its primary duties to the public, whether imposed by the charter or the common law, is sound. But the proposition that the

Legislature may authorize it to transfer to any other company by lease, the performance of those duties, is equally sound.  The mischief which it is supposed would result if leasing railway companies are not held responsible for torts, in that leases to irresponsible companies would be made for the purpose of evading liabilities, is met by two answers; first, if that was the intention, on proof of the fact, the lease would be disregarded like any other fraudulent conveyance and the lessor held responsible; second, our statutes require one-half of the capital stock of a street railway company to be subscribed, and ten per cent of the subscriptions to be paid up in cash; and to that extent, at least, a lessee company would have to start with assets.  [R. S. 1899, sec. 1186.], In the case at bar the capital stock of the Transit Company is $20,000,000 and it must have $1,000,000 of paid up capital.

The policy of the State in regard to such contracts was settled by the Legislature when it authorized the leasing of the property of one street railway company to another.  The policy is, of course, to permit such leases; for the very highest evidence of the public policy of any State is its statutory law.  But it is said that the true public purpose is to permit the lease, but hold the leasing company answerable for the torts of the lessee.  Inasmuch as there is legislation on the subject, the policy of the State must, as said, be derived from the enacted laws.  If it appears on a fair interpretation of the statutes authorizing the leasing, that the Legislature contemplated a continuance of the liability of the lessor, the law should be so declared; but if it appears that the Legislature did not construe this liability against the leasing company, but authorized leases of street railway properties with all the legal effects pertaining to lease contracts at common law, then the courts have no right to partially annul the legislative intention, or engraft on the law an exception in the

interest of what they believe would be good policy. This whole question is not one of public policy at all, but of legislative intention—of statutory construction. The publc-policy notion misconceives and misses the essential inquiry. We have a statute broadly authorizing contracts like the one before us, and the primary inquiry is whether or not the statute discloses an intention on the part of the Legislature to hold a leasing railway company responsible for torts after the lease is executed and the property transferred. The first rule for the interpretation of statutes is that' their meaning must be collected, if possible, from the language used. Of course, if a certain interpretation would lead to absurd or iniquitous results, it will not be adopted unless compelled by the language. [Bowers v. Smith, 111 Mo. 45; Fosburg v. Rogers, 114 Mo. 122; Christian v. Railway Co., 102 Mo. 373; Lamar, etc., v. Lamar, 128 Mo. 188.] We may allow, therefore, that the court may take into consideration what it believes would be for the common weal to this extent; namely, that, if one construction would be mischievous and another beneficial, and the language of the enactment permits either to be adopted, the salutary one will be preferred. The statute with which we are dealing, after enumerating other powers of street railway companies organized under the law, provides:

"Seventh. To purchase, lease, or acquire by other lawful contract, which shall include the right to purchase the capital stock and bonds of other street railroad companies, and to hold and dispose of the same, and to hold, use and operate any street railroad or roads, with all and singular its or their franchises and properties of every description belonging to any other street railroad corporation or corporations: Provided, that such purchase, lease or other contract be authorized or approved by the vote of the holders of two-thirds in amount of the capital stock of the company so purchas-

ing, leasing or otherwise contracting therefor at a meeting called for that purpose upon twenty days' notice published in some newspaper of the city or county where the general office of such street railroad company may be located, or by written notice mailed to the last known address of each registered stockholder twenty days before such meeting; and provided further, such roads connect with or intersect each other so as to allow a single passage one way over each road for a single fare.

"Eighth. To sell, lease, or dispose of by any other lawful contract, to any other street railroad company, its railroad rights, franchises, including the right to be a corporation, and all and singular its other properties of every character and description: Provided, that such sale, lease or other contract disposing of its railroad, franchises and other properties, shall be first authorized or approved by the vote of two-thirds in amount of the holders of its capital stock at a regular or called meeting of its stockholders convened pursuant to such notice as is required in the next preceding clause." [R. S. 1899, sec. 1187.]

It will be seen that the statute authorizes any railway company to purchase, lease or acquire by other lawful contract, all the franchises and property of every description belonging to any other street railway corporation, including the stock and bonds of the latter, and further authorizes the purchasing or leasing company to hold, use and operate the railway leased. The statute further authorizes any street railway company to sell, lease or dispose of by any other lawful contract, to another company, its railroad rights and franchises, including the right to be a corporation, and all and singular its other properties of every description. We remark emphatically, that as the Legislature granted street railway companies the power to dispose of their franchise to be a corporation, it could never have been

119 App.—37

the intention to hold such companies responsible for the acts of a company acquiring the franchises. When a company disposes of its right to be a corporation, it practically passes out of existence, and cannot be held responsible in any legal method which occurs to us. Moreover, a company is authorized by said lease or other lawful contract, to dispose of all its property, which shows that the law-making body did not expect it to still stand responsible for the acts of the vendee; for how could it be held responsible after all its property was gone? But it is argued that those provisions take effect only in the case of sales. The words of the statute are "to sell, lease or dispose of by any other lawful contract." Take the instance of a lease for a long term of years, covering all the leasing company's property of every kind and character; in what way would it be practicable to collect judgments from such a company? It is true the reversion of the property might be sold under execution, but that would be of very little value to the purchaser if it was under an unexpired term longer than an ordinary lifetime. To our minds, it is palpable from the statute itself, that the Legislature never thought of holding the leasing company answerable for the torts of the lessee. It fully intended to make the latter responsible; at least for all torts occurring in the operation of the road. Moreover, it is repugnant to every principle of law or justice to hold one person or company responsible for the negligence of another which it had no power to prevent. The statute empowers the lessee company to operate the road and unless the power of control is reserved by the lessor in the lease, the operation will be without any interference by the lessor. Could the Legislature expect that in that contingency the lessor should stand answerable for negligent torts? To so hold would largely annihilate the privileges granted by the statute—would frustrate the purpose of the law-making body. That

the lessee company is not responsible is a view strongly
enforced by our statute in regard to the construction of
laws; the first clause of which declares that "when
technical words and phases, having a peculiar and ap-
propriate meaning in law, are used in a statute, they
shall be understood according to their technical import,
unless that meaning is plainly repugnant to the intent
of the Legislature, or of the context of the same stat-
ute." [R. S. 1899, sec. 4160.] Now, the word "lease"
has a settled technical import. It imports a contract
by which one person, either natural or artificial, divests
himself or itself of, and another person takes possession
of lands or chattels for a term. Certain immunities
and responsibilities attach to every lease by the well-
settled rules of law, unless there are covenants to the
contrary. One of these incidents is that if the demised
property is turned over to the lessee in good condition,
the lessor is not afterwards liable for damages result-
ing from the negligent use of the property by the lessee.
[Ward v. Fagin, 101 Mo. 669, 14 S. W. 738; Gordon v.
Pettzer, 56 Mo. App. 599; Mancusi v. Kansas City, 74
Mo. App. 138.] According to the mandate of the stat-
utes for the construction of laws, the word "lease" in
the street railway statutes, must receive its ordinary
legal meaning, for there is nothing in the context re-
pugnant to that meaning; but, on the other hand, all
the contextual language points to a conclusion that the
Legislature used the word in its usual sense. Hence,
we hold that in authorizing a street railway company
to lease its property and authorizing the lessee to oper-
ate the property thus leased, the Legislature intended
that the lessee should be answerable for the manner in
which it used the property and the lessor should not be.

Furthermore, it happens that there have been other
statutes enacted in this State authorizing a railway
company to lease its property, in which the Legislature
expressly provided for the retention of liability on the

part of the lessor for the proper performance of the duties it owed the public. [McCoy v. R. R. Co., 36 Mo. App. 445.]   The same court which decided the McCoy case, stated in Brown v. R. R., 27 Mo. App. 394, 400, that railway companies cannot, "by a lease without the consent of the State, escape responsibility for the acts of the lessee  .  .  .  but with such consent it may undoubtedly do so;" citing various cases, including Mahoney v. R. R., 63 Maine 68.   The opinion then calls attention to the fact that by section 790 of the Revised Statutes of 1879 (sec. 1060, R. S. 1899) it is provided that any railroad company in this State leasing its road to a corporation of another State, should remain liable just as if it operated the road itself.   See, too, Main v. R. R., 18 Mo. App. 388.   In Markey v. R. R., 185 Mo. 348, the liability of the leasing company was expressly reserved by the statutes and hence the case is not in point as an authority on the question before us.   But from it and other cases, and from the statutes themselves, we learn that the Legislature of this State has not omitted from enactments authorizing railway leases, clauses reserving liability against a leasing railway company for the torts of the lessee, when the purpose was to continue the responsibility of the former.   Hence, it is fair to presume that when no reservation of liability was made in the act, either by express words or by implication, the intention was that the lessee alone should be answerable for its torts.

That this interpretation of the statute is a sound one, is maintained by practically all the elementary treatises and, in our judgment, by the weight of judicial opinion.   The following cases are directly in point.   Arrowsmith v. Nashville, etc., Co., 57 Fed. 165; Heron v. R. R., 68 Minn. 542; Hayes v. R. R., 74 Fed. 279; Carruthers v. R. R., 44 L. R. A. 737; Mahoney v. R. R., 63 Maine 69; St. L. R. R. v. Curl, 28 Kan. 622; Scziwak v. R. R., 4 Penn. Dist. Ct. 339; Lakin v. R. R., 13 Ore.

436; Gwathney v. R. R., 12 Oh. 92; Texas, etc., v. Mangum, 68 Tex. 342; Fisher v. R. R., 34 Hun 433; Ditchett v. R. R., 67 N. Y. 425; Mayer v. R. R., 113 N. Y. 311; Miller v. R. R., 125 N. Y. 118. The reasoning of these cases is, in the main, that when the Legislature by statute confers the authority on a railroad company to lease its properties and on another company to take and operate them, and pursuant to such statute, a lease is made turning over all the property in an unrestricted way to the lessee, the proper view is that the Legislature intended that all the ordinary incidents of a lease should accompany the transaction and the lessor not remain liable for operating torts. In Pinkerton v. Railway, 44 Atl. Rep. 284, the court said:

"The last point made by appellant is that, even if the Pennsylvania Traction Company was incorporated, the lease to it by the Columbia & Donegal Railway did not exonerate the latter from liability. But such a proposition is contrary to all the established rules of law in regard to lessor and lessee. The latter steps into the place of the former, is substituted for him, and assumes all subsequent liabilities incurred in the operation of the property leased. That is the very ground on which it is held that a corporation cannot lease or transfer any part of its franchises without express legislative or charter authority. [Nelson v. Railroad Co., 26 Vt. 721.] If a lease did not exonerate the lessor, but left his liability unaffected, and only added the liability of the lessee, no one could possibly be hurt by it, or have any standing to complain. It is conceded that a franchise is a duty imposed as well as a privilege granted, by the State, and the duty cannot be avoided or transferred to another without the State's authority. But when such authority is shown, as in the act of 1887, to motor-power companies to assume by lease the operation of passenger railway companies, it must be construed as a grant, with all the ordinary

attributes of such authority between lessor and lessee, unless the statute or the contract makes a reservation of continuing liability in the lessor. Neither is alleged in the present case. Neither Van Steuben v. Railroad Co., 178 Pa. St. 367, 35 Atl. 992, nor Hanlon v. Turnpike Co., 182 Pa. St. 115, 37 Atl. 943, have any bearing on the present question. In the former the lessee was a New Jersey company, and it was held that the statute authorizing railroads to lease their lines did not extend to a foreign corporation; and in the latter it was said that there was no evidence of authority to make the lease. The remarks on this subject must, therefore, be taken as applied to the state of facts then before the court. In other States there is some conflict in the cases, and some difference of opinion among the text-writers as to the weight of authority. But, as is well said in 5 Thompson, Corp., sec. 5884n, after stating the admitted rule that, if the lease is not valid, there is a continuing liability of the lessor: 'Some of the courts state the doctrine loosely, without any apparent regard to the question whether the lease was lawful or unlawful. . . . But by running back through the decisions of these courts on the subject, it will generally be found that in the first case stating the doctrine, stress was laid on the fact that the Legislature had not authorized the railroad company to assign its franchises, or devolve its public duties upon another person or corporation.' This points out clearly the source of most of the conflict in the cases. Two of them are specially relied on by appellant, and were cited in Hanlon v. Turnpike Co., supra; Nelson v. Railway Co., 26 Vt. 717, and Railway Co. v. Brown, 84 U. S. 445. In the former it nowhere appears that the lease was authorized by law, and in the latter the railroad was operated jointly by the lessee and the receiver of the lessor, and the passage ticket which was the basis of the action was issued in the name of the lessor company. On the general subject,

see Booth, St. Ry. Law, sec. 425; Pierce R. R., 283; Patt., Ry. Acc. Law, secs. 130, 131; 19 Am. and Eng. Ency. Law, 891, note. After consideration of both views, we are of opinion that the settled principles of law and the decided weight of authority are in favor of the rule that, where a lease is duly authorized by law, there is no further liability of the lessor for negligence of the lessee in the operation of the road."

In the Heron case (68 Minn. 542) it is said that in enacting a statute authorizing the lease without retaining the liability of the lessor, the Legislature impliedly relieved it from liability. The same doctrine is maintained in the Carruthers case decided by the Supreme Court of Kansas, and in most of the other cases cited above. The New York courts hold that an unrestricted lease of a railway, made pursuant to a statute which confers on the lessee the right to take and operate the property, stands like any other case of leasing, and that if the lessor turns property over to the lessee without any reservation of control, the latter alone is responsible for the negligent use of it. In the following text-books, the doctrine that the lessor ceases to be responsible is maintained: 2 Elliott, Railroads, sec. 469; Hutchinson, Carriers (2 Ed.), sec. —; Pierce on Railroads, 283, 284; Booth, St. Ry. Law, sec. 425; 5 Thompson, Corporations, sec. 5884; Nellis, Surface Railroads, p. 266, sec. 16; Nellis, St. Ry. Acc. Law, p. 488, sec. 6; Noyes, Intercorporate Relations, sec. 219, particularly p. 316. See, also, comments made by Judge Redfield in his work on Railways on the decision of Nelson v. R. R., 26 Vt. 721. In commenting, he says that the effect of legislative consent to the lease was not met or decided in the Nelson case. [Redfield, Railways, p. 618, note.]

Of course those commentators recognize the division of judicial authority on the question; but every one of them gives his voice in favor of the soundness, on

principle, of the proposition that the leasing company is not responsible for damage entailed by the negligence of the lessee in the operation of the road when the leasing is done under statutory authority. Plaintiff's injury was not caused by a bad roadbed, or by anything but the carelessness of the crew of the car on which she was riding; that is, the carelessness of the Transit Company's employees, whom the United Railways Company had not the least opportunity to control. Therefore, for the foregoing reasons we think the judgment in favor of the United Railways Company on the present record, was for the right party and should be affirmed.

If evidence was adduced to show that it was contemplated from the first by the incorporation of the two companies that the property should be leased to the Transit Company in order to accomplish a fraudulent purpose, and that the alleged lease was a sham; or any other fact was proved to show it was not made in good faith, but to protect the United Railways Company from debts and judgments, a very different proposition would be presented for decision. The essential fact to be shown to overthrow the lease is that it was not bona fide, but colorable—was a fraudulent conveyance. This, however, is purely a question of fact to be established by relevant evidence in the bill of exceptions touching such an issue. The proposition squarely asserted is that the United Railways Company is responsible, as a matter of law, for the injuries of the plaintiff, even if its contract with the Transit Company was a lease in legal effect and executed with an honest purpose. We do not assent to that proposition, but think the liability of the Railways Company depends on facts *in pais* and cannot be established by construing the writing purporting to be a lease.

The judgment is affirmed. *Nortoni, J.,* concurs; *Bland, P. J.,* dissents.

NORTONI, J. (concurring).—1. It is urged with much force by the learned counsel for appellant that the document introduced in evidence is not a lease, but is rather an operating contract whereby the Transit Com-, pany operated the street railroad mentioned therein and especially the line on which the plaintiff received her injury, either as an agent for, or the partner of, the United Railways Company, the owner, and the liability of the United Railways Company is therefore asserted; first, upon the theory that the principal is responsible for the negligent acts of the agent committed within the scope of the agent's authority, and while conducting the business of the principal in pursuing the agency; or, second, upon the principle of agency as applicable to partnerships in and about the conduct of the partnership business. As appears from the separate opinions of each of my associates, there is no disagreement between the members of this court on this question. After mature deliberation, we all agree: first, that the legal effect of the instrument is not such as to establish the relation of principal and agent, nor that of co-partnership between the parties, so that the United Railways Company is liable for the negligent acts of the Transit Company. It is the unanimous opinion of the court on the record before us (and that is a record devoid of either allegation or proof of fraud pertaining to the transaction), that the document on its face is, as a matter of law, a lease, whereby the United Railways Company, the lessor, demised to the Transit Company, the lessee, the property therein mentioned, etc. Second, we are likewise all of the same opinion with respect to the sufficiency of the showing made to the effect that the city of St. Louis had, by ordinance, accorded its assent to the leasing of the railroads in question, in conformity with the constitutional provisions in that behalf. From these facts, it appears that there remains but one question in the case about which there is conflict of opinion, and

on this question I fully and freely agree in the doctrine and reasons therefor announced in the very able opinion of the court prepared by Judge GOODE.

2.   Inasmuch as the identical question here presented has never been determined by the courts of last resort in this State, I deem it not improper, in view of the difference of opinion entertained by the members of this court, to set out a few of the reasons which have impelled me to the conclusion announced in the opinion of the court. I do not write because I feel that anything which should have been said, has been left unsaid, or that I can add anything of substantial worth to the very able and exhaustive review and reasoning to be found in that opinion, but on the contrary I contribute my views for no other purpose than to say that after an extended, careful and candid investigation of the subject, it has revealed itself to my mind as a marvel of simplicity which has become much immeshed in the intricate reasoning of learned judges and confounded by the misapplication of wholesome general principles not in the least pertinent here, but pertaining to a wise and sound public policy with respect to such corporations as are chartered by the State to serve all of the people, and therefore, in their nature, public institutions.   And in this connection, I may say that I have read and re-read each and all of the authorities cited in the opinions by my learned associates, both Judges BLAND and GOODE, as well as each and all of the authorities cited in the various briefs on file and such other cases, both in this country and in England, that have come under my observation, and I have studied every case upon its merits with respect to the facts before the court in each individual instance, candidly and earnestly seeking to arrive with that degree of accuracy of which the subject is worthy, at the correct principle which should influence the court in its adjudication, if there be any principle pertinent thereto other than that which applies between citizens generally

in like transactions. My labors in this behalf have been rewarded by ascertaining, beyond peradventure, as far as my own judgment and conscience are concerned, that the same principle applies here in determining the liability of the lessor with respect to the negligent acts of its lessee, in which it did not participate and over which it had no control, as applies between citizens generally, arising out of the relation of landlord and tenant, and that none other than that is pertinent.

There is indeed a marked conflict noticeable upon the first or cursory reading of the authorities. When the cases are carefully and studiously examined, this conflict is discovered to be more apparent than real. Many of the adjudicated cases rest upon facts where no statutory authority of any sort for the lease was had, and of course in such cases, on the principle that a chartered corporation cannot absolve itself of its obligation to the public without the consent of the State, the lessor has been held liable. Yet others rest upon facts where the statutes under which the lease was executed, in express terms reserves the liability of the lessor, and of course, in these cases, the liability has been properly adjudged against the lessor. In others, the injury for which the lessor is sought to be held to answer, was occasioned by the neglect of the lessor in the original construction of the property leased, and the lessor in such cases, has been held responsible on the same principle that the landlord of a building would be held responsible for an injury resulting from the negligent construction of a building in the occupancy of his lessee. In other cases, the injury for which the lessor is sought to be held was occasioned by the neglect of some positive duty affixed by the charter or general statutes against the lessor, which cases proceed upon the theory that such positive statutory obligation cannot be shifted except by equally clear and positive statutory exemption therefrom. And the other class of cases, like the one at bar, presents the

question of a lease having been made under competent legislative authority without either express exemption from or reservation of liability in the lessor, and this latter class, and none other, are in point as precedents in the case before the court. The cases are all properly classified by Judge GOODE in the opinion of the court, and I will not increase my labor by unnecessarily pointing them out. Many of the cases are classified by Judge LURTON in Arrowsmith v. Nashville, etc., Railway, 57 Fed. 165.

As said, it results from all of this that but one of the several classes of cases referred to are precedents here, and that is the line of cases in which it is sought to enforce the lessor under a statute, in broad terms authorizing the lease without any express exemption from or reservation of liability of the lessor, to respond for the negligent acts of the lessee whereby a third party, not in the employ of either, is injured. Such are the cases of Caruthers v. Railway (Kan.), 44 L. R. A. 737, where is to be found a very learned and able note on the question; see also same case, 54 Kans. Rep. 673; Arrowsmith v. Railway Co., 57 Fed. 165; Hayes v. Railway, 74 Fed. 279; Heron v. Railway Co., 68 Minn. 542; Mahoney v. Railway, 63 Me. 69; Scizwak v. Railway Co., 4 Pa. Dist. Ct. 339; Lakin v. Railway Co., 13 Ore. 463; Gwathney v. Ry. Co., 12 Ohio St. 92; Texas, etc., v. Mangum, 68 Tex. 342; Fisher v. Railway Co., 34 Hun 433; Ditchett v. Railway Co., 67 N. Y. 425; Mayor, etc., v. Railway Co., 113 N. Y. 311; Miller v. Railway Co., 125 N. Y. 118; Railway Co. v. Curl, 28 Kas. 622. In the case last cited, then judge, now Mr. Justice BREWER of the Supreme Court of the United States, clearly and aptly pointed out what appears to me to be the correct distinction as follows:

"Defendant contends that where the statute authorizes the lease by one railway company to another of its track, the lessor company is not responsible for injuries

caused by the torts of the lessee company, and in support of that doctrine cites some authorities. To a certain extent this proposition is true; if the injury results from negligence in the handling of trains or in the omission of any statutory duty connected with the management of the road, matters in respect to which the lessor company could in the nature of things have no control, then the lessee company will alone be responsible; but when the injury results from the omission of some duty which the lessor itself owes to the public in the first instance — something connected with the building of the road — then we think the company assuming the franchise cannot divest itself of responsibility by leasing its track to some other company."

It presents itself to my mind as being entirely a question of statutory construction or interpretation. Inasmuch as the Legislature is presumed to know the law, and to know and understand the meaning of words in common use, it seems that when it authorized the lease in broad language without either express exemption or reservation pertaining to the liability of the lessor, it must be understood to have employed the word "lease" as reasonable men employ the same word, with the same understanding of the law and the meaning of the word, and to have authorized the lease with the same immunities and obligations as are attributed and appurtenant to a lease between citizens generally, and that the lessor could no more be held responsible under such circumstances for the negligent acts of the lessee in which he did not participate and over which he had no control, than a lessor of a farm could be held responsible for the negligent acts of his tenant in which he did not participate and over which he had no control. And for the life of me, I can see no reason why this principle is not conducive to the end always sought to be attained by our system of jurisprudence, and that is, equal rights for one and all before the law. On principle and common justice

it seems that the obligations and immunities incident to a lease should be identical between persons, natural or artificial.

Before proceeding further on this line of argument, however, I desire to comment upon that class of cases in point and holding contra to the views herein indicated. Three points are especially noticeable about those cases holding the lessor liable in a lease authorized by the statute without reservation of liability to such third parties for the negligent acts of the lessee, cases of the following class: Railway Co. v. Hart, 209 Ill. 414; Harden v. Railroad, 129 N. C. 354; Brown v. Railroad, 131 N. C. 159; Hawkins v. Railroad, 119 Ga. 159. And these three points should be enough in themselves to place a careful and discriminating lawyer on his guard. They are: first, the same reasoning is scarcely employed in any two of them. Now, all men must concede this to be a true proposition; that is, but one conclusion on any given subject can be the correct conclusion, and to reach that conclusion, but one set of reasons can lead inevitably thereto. Therefore, when we see several courts reaching the same conclusion on a given subject and each advancing new and different reasons therefor, we are usually dubious as to the correctness of that conclusion. One of two things is evident with respect to those cases, either the courts have reached the wrong conclusion entirely, or, if the conclusion be correct, then some of them have assigned wrong reasons therefor, as they are evidently not in accord as to why their conclusion is correct. This is sufficient to shake the confidence of the profession in the conclusion reached. Second, another point about those cases is that many of them are decided by a divided court, and the majority opinion is usually accompanied with an able and vigorous dissent, and this is sufficient of itself, ordinarily, to shake one's confidence in the authority of the adjudication. See Railroad Company v. Hart, 209 Ill. 414, where three

judges join in a forceful dissenting opinion. In Harden v. Railroad Company, 129 N. C. 354, there is a very able dissenting opinion by Judge Cook, and also in Brown v. Railroad Company, 131 N. C. 455, Judge Cook dissents. Third, several of those cases are predicated upon first or prior cases, wherein the question decided in the latter case was not involved and the thought is suggested from the confidence with which the court has cited such prior case, that the matter could not have been thoughtfully considered with due care therein or else such prior case would not have been cited as having decided the identical question. But all of this is fully treated of in the opinion of the court in this case by Judge Goode, and I will say no more of it except that those considerations have proved sufficient to shake my confidence in those adjudications.

Now it seems to me that the correct view to adopt with respect to this subject is that it is essentially one of statutory construction, for we are seeking to ascertain what was the true intention of the Legislature in authorizing this lease. Entertaining this view, I have sought to gather that intention from the words of the statute itself and from such other legitimate sources as are competent, and I learn that in section 1187, Revised Statutes 1899, every street railroad corporation is declared to "have power" to do, among other things, the following:

"Seventh, to purchase, lease or acquire by other lawful contract, which shall include the right to purchase the capital stock and bonds of other street railroad companies, and to hold and dispose of the same, and to hold, use and operate any street railroad or roads, with all and singular its or their franchises and properties of every description belonging to any other street railroad corporation or corporations: Provided, that such purchase, lease or other contract be authorized or approved by the vote of the holders of two-thirds in amount of the capital stock of the company so purchasing, leasing or

otherwise contracting therefor at a meeting called for that purpose upon twenty days' notice published in some newspaper of the city or county where the general office of such street railroad company may be located, or by written notice mailed to the last known address of each registered stockholder twenty days before such meeting; and provided further, such roads connect with or intersect each other, so as to allow a single passage one way over each road for a single fare.

"Eighth, to sell, lease or dispose of by any other lawful contract, to any other street railroad company, its railroad rights, franchises, including the right to be a corporation, and all and singular its other properties of every character and description; Provided, that such sale, lease or other contract disposing of its railroad, franchises and other properties, shall be first authorized or approved by the vote of two-thirds in amount of the holders of its capital stock at a regular or called meeting of its stockholders convened pursuant to such notice as is required in the next preceding clause."

Power to execute the lease is here conferred by the competent legislative authority of the State in broad terms without any express exemption from or reservation of liability in the lessor. The Legislature, in its endeavor to expressly authorize the lease, went so far as to say that the lessor company is not only authorized to demise its tangible property, but expressly provided as well that it might lease out "its right to be a corporation." Now it seems to me that when the lessor is authorized to farm out its right to existence, which seems to preclude the motion of its remaining *in esse*, it is manifest from this alone that there could be no implication arising from a fair construction of the context of the act, that the company, after having parted with its right and rendered itself incapable of existence, should remain liable for the acts of its lessee. We are endeavoring now to ascertain the legislative intent from the words of the

act. (Of course it is understood that the lessor in this case did not purport to demise its right to be a corporation, but, on the contrary, it expressly reserved that right by apt words in the lease.) Assuming for the purpose of ascertaining the legislative intent that the company did actually farm out its right to be a corporation to another, it seems to me that the lessor, in the very nature of things, having parted with its right to existence, parted as well with its existence and thereby rendered itself, as an entity, incapable of answering for the defaults of its lessee. I must confess, however, that I cannot reconcile this provision with the idea of a lease, for to constitute a valid lease there must be a reservation of rents and the lessor must have an existence in order to enforce such reservation of rents. But be that as it may, it is a provision of the statute before the court, and it is proper to take it into consideration when seeking to determine whether the law-makers intended that by implication the lessor should remain liable. The provision positively militates against the notion of implied continued liability resting upon the lessor for the negligent acts of the lessee in which it has not participated and over which it had no control.

Now in ascertaining the meaning of the Legislature in this behalf and interpreting its language, we must remember that it is fundamental and axiomatic that "the Legislatures are presumed to know existing statutes and the state of the law relating to the subjects with which they deal." [Sutherland on Stat. Const. (2 Ed.), sec. 447.] With this rule before us, let us examine and ascertain what was the state of the law and existing statutes in the minds of the Legislature. The answer must be and is that the Legislature knew, when it employed the word "lease" in the statute, that the term had a well-understood and definite meaning in the law. To lease is to transfer for a term specified therein from the lessor

to the lessee, the property therein demised.  There are certain well-known qualities, incidents, obligations and immunities pertaining to a lease which are well ascertained and settled in the law, among which is that at common law, the lessor is not answerable for the tenant's negligence in the use or occupancy of the leased premises resulting in injury to a third person unless some right of control in such respect is retained by the lessor.  [2 Wood, L. & T. (2 Ed.), 851.]  Now, this being the state of the law on the question, the rule of construction stated supra requires the court to hold that the Legislature knew this full well and knew what other reasonable men knew; i. e., unless it affixed, by express language, other and additional obligations as incident to the word "lease" thus employed than those which were ascertained and settled in the law, it would be understood to have intended none.

Entertaining this view, as said before, the whole matter seems to me to be one of great simplicity and after much wandering through mazes of authorities, which to my mind confuse the subject by attempting the application of far-fetched principles and remote doctrines pertaining to public corporations and public policy with respect thereto, I am persuaded that the only correct solution is to be found by the courts remaining in close proximity to the subject and adhere to the reasoning indicated, just as we would were a citizen attempting to hold a farmer who had let his premises to a tenant without reserving any portion of the management or control, for the negligent acts of such tenant, in which the lessor did not participate and over which he had no control. And in such case, no one would attempt to argue or affix liability on the lessor.

Now that this is the correct view, appears to me to be settled beyond all question from the language of the first clause of our statute on "laws" or the "construction of statutes," bearing in mind, as said by Mr.

Sutherland, "the Legislatures are presumed to know the existing statutes and the state of the law relating to the subjects with which they deal." We find that at the time the Legislature, in its wisdom, provided the act authorized in the lease, it had before it the following statutory provision on the construction of statutes:

"The construction of all statutes of this State shall be by the following additional rules, unless such construction be plainly repugnant to the intent of the Legislature, or of the context of the same statute: First, words and phrases shall be taken in their plain or ordinary and usual sense, but technical words and phrases having a peculiar and appropriate meaning in law, shall be understood according to their technical import." etc. [Sec. 4160, R. S. 1899.]

Now with this statute, addressed as it is to the courts commanding that they shall so hold with respect to the meaning of the word "lease" employed, on what legitimate process of reasoning can the court arrive at a conclusion other than that the Legislature intended that the court should perform its positive duty imposed by this statute and hold that the word "lease" employed by them is a lease as understood in the law with its ordinary qualities, incidents, attributes, immunities and obligations, and none other. Now, the only presumption the court can indulge is that of laudable motives and correct conduct. We cannot and we will not, for it is against common sense and good morals to do so, presume that the Legislature deliberately enacted the statute employing the word "lease," intending that the courts should stultify themselves by as deliberately proceeding contrary to the positive commands of the statute on the construction of laws, quoted supra, and hold that the word "lease" as employed, was intended to have a meaning other than that ordinarily understood in the law. To sustain the contention of appellant in this case, and engraft upon the word "lease" an additional incident

which affixes an obligation upon the landlord or lessor other than and in addition to the obligation of the same parties at common law, amounts to no more or less than the court's deliberately closing its eyes to this positive statute and stultifying itself in attempting to apply some high-toned and refined dogma of public policy to this question, when it is entirely beside the case, inasmuch as all questions of public policy are forever foreclosed to the court by the positive legislative enactment authorizing the lease. As far as I am concerned, the positive provisions of our statute on the construction of laws quoted, is conclusive on the courts of this State as to what meaning should be given to the word "lease" in this case and the consequent incidents, attributes, immunities and obligations appurtenant thereto, and I am authorized to say that Judge GOODE fully concurs in what I have said. It seems that the matter ought to be rested on this alone, and I am perfectly willing to so rest it, but inasmuch as the question is new in Missouri, and of paramount importance, I feel that a charitable profession will not be so unkind as to condemn me for offering further reasons in support of the judgment of the court.

It appears from other statutes that the Legislature, acting with the full knowledge of the prior state of the law as pertaining to the obligations and immunities incident to leases, and with a full understanding of its mandate addressed to the courts of the State, commanding them to give to technical words employed their technical import, has seen fit to provide other statutes authorizing railroad leases, and indulging the reasonable presumption, of course, that courts will do their duty in construing such statutes, and attach to the word "lease" its technical import as commanded, the Legislature therefore signified its intention with respect thereto when it sought to affix additional obligations upon the lessor, as in section 1060, Revised Statutes 1899, autho-

rizing the lease of a domestic railroad to a foreign and connecting road, by expressly reserving the liability of the lessor. This enactment, however, cannot be said to change the meaning of the word "lease." The result is only a positive statutory obligation affixed against and upon those lessors who avail themselves of the provisions of the statute by leasing. But it is suggested that the law-making power was moved to this with the wholesome purpose of retaining within the jurisdiction of the State some responsible party for the injury inflicted by the operation of a road, in virtue of the franchises it had granted, to the end of protecting the rights of citizens by affording them ample redress for private injuries in the State courts against a domestic corporation; all of which is true, but this laudable purpose entertained and enacted into law by the Legislature can in no manner relieve the proposition of its intrinsic worth and weight in the case at bar, for it is obvious and the thought to be gleaned therefrom is that had not the Legislature understood full well that the lessor could not be held to respond for the acts of the lessee and that by its statute on laws, it had commanded the courts to give to the word "lease" its technical import, it certainly would have proceeded upon the theory that in virtue of the public policy notion, the lessor would remain liable at all hazards without the express reservation of liability contained in that statute. This statute is referred to as tending to show that it is the policy of our Legislature on this question when it seeks to enjoin an additional burden upon the lessor, it does so by express words and does not shirk its responsibility by enacting statutes silent on the subject, expecting the courts to engraft the additional incident upon the word "lease" by construction and thereby impose an additional burden upon the lessor which it is competent for the legislative authority alone to do.

Many of the cases holding the lessor in an autho-

rized lease liable for the negligent acts of the lessee, cite
as authority for the proposition the earlier English case
cited by Judge REDFIELD in Nelson v. Ry. Co., 26 Vt.
717, as well as the cases of Railway Co. v. Barron, 5
Wall. 90; Railway Co. v. Brown, 17 Wall. 445; Railway
Co. v. Winans, 17 How. 30; Railway Co. v. Dunbar, 20
Ill. 623, and such later cases as Thomas v. Railway, 101
U. S. 71, and numerous others which it could serve no
good purpose here to assemble, in view of the diligence
in that behalf displayed in Judge GOODE'S opinion.

Now it is proper to say of the Nelson case, that the
author of that opinion, Judge REDFIELD, in the fifth edi-
tion of his work on Railroads, in a note on page 618, vol-
ume 1, points out a fact which does not appear in the
opinion; to-wit, that the question of a lease authorized
by statute, was not before the court in that case at all.
In the other cases last above cited, resting upon consid-
erations of public policy, there was no legislative autho-
rity for the lease, and in that event, the public-policy
doctrine was certainly correct, for it is a matter within
the province of the Legislature to authorize the lease or
not, as it sees fit, and in the event no such authorization
is had, the proposition is absolutely sound, for it is most
certainly against public policy to permit the transfer of
the duties and obligations appurtenant to public corpora-
tions and involved in such transfers without the consent
of the State. The doctrine is eminently sound as predi-
cated upon the principle that the act of incorporation
and accepting a charter from the State, constitutes a
contract between the corporation and the State. This
being true, the attempted lease, whereby one party to
this contract seeks to shift the responsibilities arising in
virtue thereof upon a lessee of its own choice without the
consent of the State, that of the other contracting party,
first being had and obtained, must fail as being in con-
flict with the most elemental principles of contract law.
This must be true in such cases the same as the identi-

Moorshead v. United Railways Co.

-cal proposition is true in ordinary contracts between individuals, but the doctrine of those cases should have no application in this, where the other party to the contract, the State, has first given its consent to execute the lease. Now it appears to me that this public-policy notion, as applicable to an authorized lease, is in conflict with fundamental principles, unsound and entirely foreign. Where is there any question of public policy in the record before this court? I have been unable to discover any fact which raises that question for our consideration. By the legislative act authorizing the lease, all questions of public policy in this case are forever foreclosed so far as the courts are concerned.

I will devote a moment to what seems to me to be a conclusive answer to this entire proposition, and it ought not to require but a moment to dispose of a question so palpably at variance with fundamental principles. In the first place, all lawyers know that in a representative government, it is axiomatically true that the legislative authority, within the limits of the Constitution, is the general guardian of the policy of the State pertaining to all internal affairs. This proposition must be true under our form of government, and it necessarily follows, when the competent legislative authority has, by solemn enactment, provided thus or so, on any given subject within its constitutional powers, that this enactment is a manifestation of the public policy of the State on that question, of the very highest and first importance, and that the judicial department thereof is bound thereby, and while the general sources for determining the public policy of a State are its Constitution, laws and decisions of the judicial tribunals, it is primarily true that a legislative enactment within the constitutional limits, is of very first importance and the judicial department is without authority to hold otherwise. This proposition is so thoroughly grounded in both principle and the reasons underlying and support-

ing constitutional and representative government, that no one will dispute it. It is laid down as a proposition universally true in the 15 Amer. and Eng. Ency. Law (2 Ed.), 934, as follows:

"Where the Legislature, by a statute not objectionable as being unconstitutional, expressly authorizes the execution of a particular contract or class of contracts, the courts are without power to declare such contracts illegal as against public policy, as when the government through its legislative branch has determined its public policy the judicial branch is bound thereby." See, also, large number of cases cited in note one, thereunder.

It is unnecessary to multiply authorities on this proposition which is familiar to the entire profession. This being true, I am at a loss to understand how this or any other court could predicate upon a question of public policy which has been, by legislative enactment, entirely foreclosed to it and say that the contract of lease authorized by it is a different and distinct lease from that so universally understood in the law, or that any rule of public policy asserted could be violated by the lessor transferring the operation of its properties to another under such express statutory authority from the express guardian of all public policy.

Now it is certain that the lease would be wholly invalid without legislative authority. The Legislature might permit it, if it saw fit, and it might affix whatever burdens it saw fit in connection with the authority, but having affixed none and granted broad authority to lease, it is not for the court to invade its province and incumber the right which it has freely granted. Indeed, on this question, the reasoning of the very learned and able Judge ELLIOTT seems to me so terse, exhaustive and complete that I adopt it here in full at the expense of prolonging the opinion:

"Our opinion is that where the lease is executed under the provisions of a statute, in accordance with its

requirements, is made to a company having authority to accept it, and is made in good faith and not for the purpose of transferring duties or obligations to an irresponsible party, the lessor company is not liable for injuries caused by the negligence of the lessee and not attributable to a breach of any public duty of the company that executed the lease. It must be assumed that in granting the authority to execute a lease the Legislature had in mind former statutes as well as the established rules of the common law. When power to execute a lease is conferred upon a corporation the Legislature must in the absence of countervailing language, be deemed to intend to authorize the execution of such an instrument as the established law regards as a lease. The law enters as a silent factor into every contract, and hence of every lease it is an important element. The legal effect of a lease is to transfer for a prescribed period of time the possession and control of the property to the lessee. In authorizing the execution of a lease, the Legislature grants the right to execute and carry into effect such an instrument as divests the lessor of possession and control and places it in the lessee to the exclusion of the lessor. The possession of the one party is excluded and that of the other is made complete by the legislative sanction. If a sale is made under valid legislative authority the company that acquires the property acquires an exclusive right and interest, and the lessee by virtue of the lease acquires a similar right so far as possession, control and management are concerned, for the term for which the property was leased. It can not be doubted that a statute conferring general authority to sell, means a complete and effective sale, and upon the same principle it must be concluded that the power to lease, unless qualified and limited by statute, is a power to make a complete and effective lease. A complete and effective lease certainly vests the right of possession, control and management in the lessee, since no other effect can be

assigned such a lease without a direct and palpable vio-
lation of long and well-established principles of law.
The lessor company does no wrong in executing a lease
which the law of the land gives it full power to execute,
so that in executing the lease there is no improper mo-
tive, no illegal act, nor any wrongful attempt to escape
a duty. In granting authority to lease, the Legislature
empowers the lessor company to transfer the duty of
operating the road to the lessee, and in doing what the
Legislature authorizes, no rule of public policy is violat-
ed. It is, indeed, inconceivable that there can be a
violation of a rule of public policy where the act done
by a party is done under a legislative enactment and in
accordance with its provisions. The cases which hold
the lessor liable, although the lease is an authorized one,
upon the ground that there must be an express exemp-
tion from liability in order to exonerate the lessor, con-
cede, what could not be denied without leaving the do-
main of reason, that the Legislature may by express en-
actment exonerate the lessor, so that, even upon that
theory (which we believe to be unsound) the question,
at bottom, is one of statutory construction. The courts
which assert the theory mentioned tacitly assume that in
granting authority to lease, the Legislature granted
something less than an authority to lease. We believe
that the only theory that can be defended on principle
is that in granting authority to execute a lease the Legis-
lature conferred authority to execute an effective in-
strument with all the qualities and incidents with which
the law invests a lease. If this be true then the lease
does not transfer possession and control from one party
to the other for the term of the lease, and the rights and
obligations of the parties are such, and such only, as the
law annexes to the relation of lessor and lessee. For
negligence in managing and using the demised pre-
mises the lessor is not responsible. If it had performed
its duty in constructing tracks and the necessary struc-

tures, it can not be held responsible for the negligence of the lessee in employing incompetent servants, or in negligently handling trains, or in negligently overloading cars, or in negligently failing to provide a sufficient number of persons to manage trains, or for any negligence which relates solely to the mode of operating the leased road." [2 Elliott on Railways, sec. 469.]

The reasoning of Judge ELLIOTT quoted, is to my mind so illuminating, exhaustive and conclusive on the question in its entirety that I shall leave the subject except to say that we find the almost unanimous views of the text-writers to the same effect, which can only augur that those truly learned in this department of the law, who have devoted much time, careful thought and labor to investigating the adjudications thereon, have, with marked unanimity, arrived at the conclusion announced by this court. And it is worthy in this connection to say that Judge THOMPSON, who is always found lifting his voice in favor of equal rights for all before the law, says, in his work on Private Corporations, vol. 5, sec. 5884, on this question: "On the other hand, if the lease has been made under authority of law, then, on principle and the better opinion, the lessor company is not liable for damages done by the lessee company, or its servants, in operating the road, unless there is a statutory reservation of such liability."

See also the following authors: Hutchinson on Carriers (2 Ed.), sec. 515; Peirce on Railroads, p. 283; Booth, Street Railway Law, sec. 425; 5 Thompson on Private Corporations, sec. 5884; Nellis, Street Railway Accident Law, p. 488, sec. 6; Nellis, Surface Railroads, p. 266, sec. 16; Noyes, Intercorporate Relations, sec. 219, particularly p. 316. See also comments of Judge Redfield in his work on Railways discussing the case of Nelson v. R. R., 26 Vt. 721, heretofore cited; 2 Elliott on Railways, sec. 469. It is also worthy of mention that this, too, is the opinion entertained by the author of the

very able and instructive note on the subject to Caruthers v. Railway, 44 L. R. A. 737, as appears on page 745, where it is said that if the lease is authorized by statute and made without reservation of any control over the operation of the road, the lessor is exempt from liability for the torts committed by the lessee.

For the reasons given, I concur with Judge GOODE in the opinion that under a valid lease of this character, authorized by the Legislature without reservation of liability thereon, the lessor is no more responsible for the negligent acts of the lessee in which it did not participate and over which it had no control than is the landlord at common law liable under the same circumstances for the negligent acts of his tenant. Entertaining these views, I am of opinion that the very learned trial judge properly ruled in sustaining the motion for a new trial as to the defendant, United Railways Company, and that his ruling should be sustained. The judgment should be affirmed.

BLAND, P. J. (dissenting).—Suit was begun against the St. Louis Transit Company and the United Railways Company, as joint owners and joint operators of the Eighteenth street line of railroad, in the city of St. Louis. The petition alleged that through the negligence of these two companies in operating one of their cars, on said Eighteenth street line, upon which plaintiff was a passenger, she was injured. The answer was a general denial.

Plaintiff's evidence shows negligence in the operation of a car, on which she was a passenger, on said line, causing injury to her. It is admitted that the Transit Company alone operated the car. To connect the other defendant with the Transit Company in the operation of the car, or to make it liable for the negligence of the Transit Company, the plaintiff offered in evidence the following contract of lease and showed that the Eigh-

teenth street line of railroad is included in the terms of
the lease.

"Contract of the Lease between United Railways of St
     Louis and St. Louis Transit Company:

"This agreement made and entered into between the
United Railways Company of St. Louis, hereinafter call-
ed 'United Railways,' a corporation duly organized and
existing under the laws of the State of Missouri, party
of the first part, and the St. Louis Transit Company,
hereinafter called 'Transit Company,' also a corpora-
tion duly organized and existing under the laws of the
State of Missouri, party of the second part, witnesseth,
that

"Whereas, 'United Railways' is the owner of sever-
al lines of railway in the city and county of St. Louis,
in the State of Missouri, and of certain bonds and stocks
more specifically described in a certain deed of trust to
the St. Louis Trust Company, bearing date September
20, A. D. 1899, and is willing to lease all of its said lines
of railway lying and being situated in the city and
county of St. Louis, including all the property and fran-
chises appurtenant thereto, together with all income to
be derived from said bonds and stocks to 'Transit Com-
pany' for the period beginning on the first day of Octob-
er, A. D. 1899, and ending on the first day of April, A.
D. 1939, upon the terms and conditions hereinafter stat-
ed; and

"Whereas, Transit Company is desirous of acquir-
ing the said lines of railway including all the property
and franchises appurtenant thereto, together with any
and all income derived from the ownership of the bonds
and stocks now owned by United Railways or which it
may hereafter acquire during the term of this lease.

"Now, therefore, this agreement witnesseth, that
United Railways for and in consideration of the cove-
nants and agreements hereinafter contained on the part
of the Transit Company, to be by it made, kept and per-

formed, has granted, demised and leased, and by these presents does grant, demise and lease, unto Transit Company, all of the railways now constructed, owned or operated by it, or which may be hereafter constructed, owned or operated by it, and all its rights, title and interest in and to all its property, real, personal and mixed, now held by it, as owner or otherwise, with all franchises of every sort and kind, to it now belonging, or which it may hereafter acquire, as fully as it now holds, or owns, or may acquire the same, together with all income derived from any bonds or stocks now owned by the United Railways, or which may be hereafter acquired by it, provided, always, however, that nothing herein contained shall operate to grant or demise, or be construed to include, the franchise to be a corporation heretofore granted to the said party of the first part, or any other right, privilege or franchise, which is, or may be, necessary to preserve the corporate existence or organization of the party of the first part under its charter, and all the rights, privileges and franchises last aforesaid are hereby expressly reserved and excepted from these presents.

"To have and to hold said demised property, real, personal and mixed, with the franchises unto Transit Company, its successors and assigns, for the full term from the first day of October, A. D. 1899, until the first day of April, A. D. 1939.

"In consideration of the premises United Railways covenants and agrees that Transit Company, its successors and assigns, shall, at all times during the term aforesaid, have full and exclusive power, right and authority to use, manage and operate the said railways of United Railways and shall have the right to fix the tolls thereon, but not at a higher rate than United Railways is authorized so to do; and further, that Transit Company shall have the full, free and exclusive right to charge and collect all the tolls to accrue from the railways

of United Railways during the said term and appropriate the same to its own use, and shall have, use and exercise all the rights, powers and authorities aforesaid, and all other lawful powers and privileges which can be lawfully exercised and enjoyed on or about the said demised railways, properties, franchises and premises, as exclusively, fully, amply and entirely as the same might or could have been used by United Railways had this lease and contract not been made.

"And in consideration of the premises Transit Company has agreed, and does by these presents agree, to and with United Railways as follows, to-wit:

"1. That it, Transit Company, shall and will during the continuance of this lease, at its own proper cost and expense, and without deduction from the rent herein provided to be paid, maintain, operate, work, use and run, and keep in public use the said demised railways in the same manner as United Railways, as the owner or lessor thereof, is now, or at any time hereafter may be required to do. And Transit Company shall and will, at its own proper cost and expense and without deduction from the rent herein provided to be paid, at all times, during the continuance of this lease, maintain, operate and keep the railways, property and premises hereby demised, and every part of the same, in good repair, working order and condition, and supplied with rolling stock and equipment, so that the business of said demised railway shall be increased and developed. And Transit Company hereby agrees and promises to and with Railways Company, that it, Transit Company, shall and will, at its own proper cost and expense, and without deduction from the rent aforesaid, from time to time, during the term aforesaid, do, or cause to be done, to and upon the said demised premises and railways, any and all repairs and replacements and any and all additions thereon and improvements which may be reasonably required for the purposes aforesaid, and provide

thereon such new and additional rolling stock, equipments and other appliances, as shall and may be reasonably required for the purpose aforesaid; and Transit Company shall and will use all reasonable efforts to maintain, develop and increase all the business of the railways hereby demised.

"Transit Company shall and will keep a complete and accurate record of all additions, acquisitions, betterments, and improvements made by it upon said demised premises and property and the amounts of money expended therefor, and shall, from time. to time file the same with Railways Company, and thereupon, when requested by resolution of the board of directors of Transit Company, Railways Company will deliver to Transit Company, or its order, any of its unissued first general mortgage bonds at par on payment for the money so expended, which it would be authorized to use, for the same purpose under the terms and conditions of the mortgage securing said bonds; or, in payment for said sums of money so expended by Transit Company, Railways Company will deliver at par, when requested, as aforesaid, to Transit Company any of its unissued preferred or common stock.

"And Transit Company will indemnify, save and keep harmless, during the continuance of this lease, United Railways from all costs, charges and expenses arising from the management and operation of said railways, and all matters incident thereto.

"2.   That Transit Company shall pay to Railways Company a net annual rental of five dollars per share upon all the preferred stock of Railways Company, now outstanding or which may hereafter be issued by Railways Company with the consent of Transit Company; said rental shall be payable quarterly on the tenth days of January, April, July and October during each and every year hereafter for the full period of this lease, provided, however, that the first quarterly payment shall be

made on the tenth day of April, 1900. Payments of the rental herein provided for shall be made at the office of the Transit Company in the city of St. Louis, or at the agency of the Transit Company in the city of New York, either or both, as Transit Company, shall from time to time, determine.

"3. That in addition to the rental provided to be paid by Transit Company in paragraph two of this lease, Transit Company shall pay to the United Railways the further sum of one thousand dollars per annum, for the purpose of defraying the expense of maintaining the corporate existence of the railway and traction companies connected with, or interested in, the properties and franchises herein mentioned, which sums shall be paid semiannually in equal installments at the times and at the place or places hereinabove provided for the payment of the rental.

"4. That in addition to the amounts hereinabove provided to be paid by Transit Company to United Railways in paragraphs two and three hereof, Transit Company hereby assumes and agrees to pay all the floating debts of United Railways when and wherever the same may become due and payable.

"5. That Transit Company shall and will also during the continuance of this lease, pay all taxes and assessments and water rents which may be assessed upon the real estate, personal property, franchises, capital stock, business, rental, income, dividends and indebtedness of United Railways, or any of the lines of railways or property leased or operated by it.

"6. That Transit Company shall and will also pay the interest accrued, and to accrue, as the same becomes respectively due and payable, on all the bonds heretofore issued, and now outstanding, by Railways Company, or any of the subordinate companies whose property and

119 App.—39

franchises Railway Company has acquired, said bonds being as follows:

"The Missouri Railroad Company five per cent bonds, of date February 27, 1896, due March 1, 1906, seven hundred thousand dollars.

"The Forest Park, Laclede & Fourth Street Railroad Company seven per cent bonds, of date May 1, 1885, due June 1, 1900, ninety-two thousand and one hundred dollars.

"The Lindell Railway Company five per cent bonds, of date August 1, 1891, due August 1, 1911, one million five hundred thousand dollars.

"The Compton Heights, Union Depot & Merchants Terminal Railroad Company six per cent bonds, of date July 1, 1893, due July 1, 1913, one million dollars.

"The Taylor Avenue Railway Company six per cent bonds of date July 1, 1893, and due July 1, 1913, five hundred thousand dollars.

"The Union Depot Railroad Company six per cent bonds, of date October 1, 1890, due October 1, 1910, seven hundred and ninety-one thousand dollars.

"The Union Depot Railroad six per cent bonds, of date June 1, 1893, due June 1, 1918, two million four hundred and nine thousand dollars.

"The Mound City Railway Company (road subsequently acquired by Union Depot Railway Company) six per cent bonds, of date October 1, 1890, due October 1, 1910, three hundred thousand dollars.

"The Jefferson Avenue Railroad Company five per cent bonds, of date November 2, 1895, due November 2, 1905, two hundred and seventy-seven thousand dollars.

"The People's Railway Company (property now owned by St. Louis Traction Company) six per cent bonds, of date May 1, 1882, due May 1, 1902, one hundred and twenty-five thousand dollars.

"The People's Railway Company (property now owned by St. Louis Traction Company) seven per cent

bonds, of date May 1, 1886, due May 1, 1902, seventy-five thousand dollars.

"The Southern Electric Railroad Company six per cent bonds, of date May 1, 1884, due May 1, 1904, one hundred and sixty-four thousand dollars.

"The Southern Electric Railroad Company six per cent bonds, of date May 6, 1890, due May 1, 1915, three hundred and thirty-six thousand dollars.

"The Southern Electric Railroad Company five per cent bonds, of date August 1, 1896, due August 1, 1916, two hundred thousand dollars.

"The Cass Avenue and Fair Grounds Railway Company five per cent bonds, of date July 1, 1892, due July 1, 1912, one million eight hundred and thirteen thousand dollars.

"The Citizens Railway Company six per cent bonds, of date July 1, 1887, due July 1, 1907, one million five hundred thousand dollars.

"The United Railways Company of St. Louis first general mortgage four per cent bonds, of date September 20, 1899, due July 1, 1934, twenty-three million dollars; and Transit Company shall and will also pay all interest that shall accrue upon all further issue of said first general mortgage bonds issued by Railways Company, under the terms and conditions of the said mortgage deed of indenture securing the same.

"7.  That Transit Company shall and will, at all times, keep the property of Railways Company insured against loss by fire, paying the premiums therefor from its own funds, and will, at the expiration of this lease and contract, yield and deliver up the hereby demised railways and properties and their appurtenances, in the same good order and repair as the same are now in, or may be put in during the hereby demised term (reasonable wear and tear excepted), excepting any property sold in accordance with this agreement and contract.

"8. That Transit Company shall and will during the continuance of this lease apply all net surplus earned by it over and above the six per cent annual dividend upon the $20,000,000 of capital stock which Transit Company is now authorized to issue, or so much thereof as may from time to time be outstanding, to the betterment, improvement, or extension of the property or railway lines now owned, or which may hereafter be acquired by Railways Company, or to the redemption, payment or retirement of the mortgage indebtedness of Railways Company or of its subordinate companies. In case Transit Company shall purchase out of said surplus earnings any of the underlying bonds issued by any of the subordinate companies, whose property, franchises or stock has been acquired by Railways Company, Transit Company shall have the same right to use the first general mortgage four per cent bonds, which Railways Company, under its mortgage, is authorized to receive in exchange from said underlying bonds of said subordinate companies, in the same manner and to the same extent as Railways Company would have the right under said mortgage to use the same, the Railways Company shall and will do all things requisite or necessary on its part to be done to carry this provision into full force and effect.

"9. That Transit Company shall and will apply all moneys received by it from Railways Company at the time that this lease goes into effect, save and except what may be necessary to meet current liabilities, including interest accrued upon all mortgage indebtedness, to the improvement of the premises hereby demised and shall make like disposition of all moneys that Transit Company may subsequently receive from Railways Company through, the sale of property that may become useless in the conduct of the business of Railways Company; and Railways Company shall and will turn over to Transit Company all moneys of every character in its pos-

Moorshead v. United Railways Co.

session, or to which it may be entitled, at the time that this indenture goes into effect, and all other moneys that it may subsequently become possessed of from any source whatever, during the term of this lease.

"10. That it is the purpose and understanding of the parties hereto that these presents shall go into effect immediately upon their execution and delivery, and all the rights and liabilities of the parties hereto, as herein assumed, covenanted for and agreed to, shall, upon due execution and delivery hereof, become fixed and ascertained, United Railways Company turning over all assets of every character to Transit Company, and Transit Company assuming all liabilities of every character of United Railways.

"11. That United Railways shall and will, during the term of this contract, maintain its corporate existence and organization, and at all times, from time to time, during the said term, and when requested by Transit Company, its successors or assigns, shall and will put in force and exercise each and every right, and do each and every corporate act, which it may now, or at any time hereafter, lawfully put in force, or exercise, to enable Transit Company to enjoy and avail itself of every right, franchise and privilege in respect to the use, management, renewal, extension or improvement of the premises herein described, or intended so to be, or the business to be carried on, Transit Company agreeing to indemnify and save harmless United Railways against all expense, loss, damage or liability for such exercise of corporate power or performance of corporate acts when exercised or done at the request of Transit Company.

"12. That in case Transit Company, its successors or assigns, shall, at any time or times hereafter, during the continuance of this lease, fail, or omit to pay, as the same becomes due and payable, the interest due upon any of the bonded indebtedness recited in section six

of this lease, or in case Transit Company, its successors or assigns, shall fail or omit to pay the floating indebtedness hereinbefore mentioned and provided to be paid by Transit Company, its successors or assigns, or any part thereof, when the same shall become due and payable, as hereinbefore specified, then immediately upon the happening of such event, it shall be lawful for United Railways, at its option, to treat this lease as forfeited; or in case Transit Company, its successors or assigns, shall fail or omit to keep and perform the covenants and agreements herein contained, or any of them, and shall continue in default in respect to the performance of such covenants or agreements for the period of sixty (60) days, then and in either and every such case it shall be lawful for United Railways, its successors or assigns, to treat this lease as forfeited; and in case United Railways shall, for any such cause, decide to treat the lease as forfeited, it shall be lawful for United Railways, its successors, or assigns, at its own option, to enter at once upon the railways and premises hereinbefore demised, and along and upon every part thereof, and remove all persons therefrom, and from thenceforth the said demised railways and premises, with the equipments and appurtenances thereof, to have, hold, possess and enjoy as of the first or former estate of United Railways in the said demised premises, and upon such entry for non-payment of the interest on the bonded indebtedness as above provided, or for non-payment of the floating indebtedness as herein provided, for non-payment of rent, or breach, or non-performance of any covenant or agreement therein contained to be by Transit Company, its successors or assigns, observed or performed, all the estate, right, title, interest, property, possession, claim and demand whatsoever of Transit Company, its successors or assigns, in or to the addition and improvements above mentioned, and in or to the same demised railways and premises, or either, or any part of them, as well as all the right, title

and interest of Transit Company, its successors and assigns, in, under and by virtue of this lease, shall wholly and absolutely cease, terminate and become void, anything hereinbefore contained to the contrary in anywise notwithstanding.

"And in case of the re-entry aforesaid, the floating indebtedness, interest and rent provided herein to be paid, shall, up to and until the date of re-entry, be deemed and taken as due and payable, and the same shall be paid by the Transit Company, its successors and assigns.

"And it is further declared and agreed that such re-entry shall not waive or prejudice any claim or right of Railways Company, its successors or assigns, for damages against Transit Company, its successors or assigns, on account of such non-performance or breach of any of the terms of this lease; and all such claims and rights are hereby expressly preserved to the said Railways Company, its successors or assigns.

"13.   That all cars, machinery, tools, appliances, etc., generally called personal property, of every sort and kind belonging to the United Railways Company, or held by it as lessee, shall, when this lease goes into effect, be delivered to Transit Company.   The same shall be valued by mutual agreement, and, in case said parties cannot agree as to the value, then by appraisers to be appointed in the manner hereinafter provided.   In case of the termination of this lease and contract for any cause, Transit Company shall return the said property as inventoried and appraised, in as good order and condition as when received, or the equivalent thereof, or pay the amount of such valuation to United Railways, with interest from the date of the termination of this lease.

"14.   Upon the termination of this lease, for any cause arising from breach of covenant by Transit Company, all such property necessary to the operation of the lines of United Railways, as enumerated in section 13 of

this agreement, and all betterments to the property that may be made by Transit Company, by which is meant all cars, tools, tracks, rails, roadbeds, wires, poles, motors and appliances that may by Transit Company be put upon the lines and property of United Railways, and necessary to the operation of the said road, shall become the property of United Railways.

"15. That Transit Company shall, at all times, keep at its office in the city of St. Louis, full, true and just accounts of any and all moneys received and business done upon the said demised railways, and of all moneys paid, laid out and expended, all liabilities incurred in connection with the same. The accounts to be kept by Transit Company as above provided, and any and all accounts which shall, and may be kept, in relation to the said demised railways, or the business of the same, shall, at all reasonable hours and times during the continuation of this lease, be open to the inspection and examination of the president of the United Railways and such other person or persons as United Railways shall, from time to time, by resolution of its board of directors, appoint to examine the same.

"16. That all differences which may arise between the parties hereto at any time hereafter, as to the construction of this agreement, or as to the due performance of any covenant herein contained, or as to the value of any property to be allowed by either to the other, shall be conclusively settled by the decision of the three arbitrators, or by a majority of them in case of disagreement; such arbitrators to be chosen in the manner following, to-wit: Railways Company shall select one of the arbitrators and Transit Company shall select one, and the two thus chosen shall select a third. In case either party shall fail to select an arbitrator for the period of ten days, after a request in writing delivered to the president, then the arbitrator appointed by the party not in default shall select an arbitrator for the defaulting

party, and these two shall proceed as herein provided in case of the selection by each party.

"17. That all the terms and covenants of this lease and agreement shall bind the parties, their respective successors and assigns; it being intended that the benefits of all covenants shall accrue to successors and' assigns, as well as to the original parties, and that performance shall be by successors and assigns as well as by original parties.

"18. That Railways Company covenants and agrees from time to time to make any further deed or indenture to carry out these presents that Transit Company may reasonably demand."

Plaintiff also showed that on January 23, 1904, the day on which plaintiff was injured, the following constituted the board of directors of the Transit Company, to-wit: Murray Carleton, Corwin H. Spencer, Henry S. Priest, James Campbell, Robert McCullough, George L. Edwards, Finis E. Marshall, Eugene Delano, Alonson D. Brown and Louis A. Cella, Murray Carleton being president and James Adkins secretary; and that on the same date the board of directors of the United Railways Company consisted of Murray Carleton, Corwin H. Spencer, Henry S. Priest, James Campbell, Robert McCullough, George L. Edwards, Finis E. Marshall, Eugene Delano, Alonson D. Brown and Edward G. Conrads, Murray Carleton being president, Corwin H. Spencer, vice-president and James A. Adkins, secretary.

It was admitted that since the beginning of the suit, the United Railways Company has taken the leased property the Transit Company was operating under the lease and has operated it since taking it from said company.

Defendant offered in evidence a number of ordinances of the city of St. Louis, authorizing the construction of a number of street railways in the streets of said city, including the Eighteenth street line, and ordinance No. 19738; in the first paragraph of the first section of

which ordinance, a number of street railways, including the Eighteenth street line, are named. Section 3 of the ordinance authorized corporations owning the roads named in paragraph 1, of section 1, "to sell, convey or lease, if found desirable, their property, rights, privileges and franchises, . . . to any of the said companies named in this section, or to the St. Louis Transit Company, its successors and assigns." It was admitted that the United Railways Company acquired by purchase all the railroads mentioned in the first paragraph of section 1. It was also admitted that two-thirds of the stockholders of the Transit Company and of the United Railways Company duly passed resolutions consenting to and authorizing the aforesaid contract of lease, and that the lease was properly executed.

Under the instructions of the court, the jury found for plaintiff and awarded her substantial damages. The United Railways Company filed its separate motion for a new trial and in arrest of judgment. The court sustained its motion for new trial on the sixth, fourteenth and fifteenth grounds assigned in said motion. They are as follows:

"6. The court erred in allowing the case to go to the jury as to this defendant.

"14. The court erred in admitting, over the objection of this defendant, the lease offered in evidence by plaintiff.

"15. The court erred in refusing to give the peremptory instructions in the nature of demurrers, offered by this defendant at the close of plaintiff's evidence and at the close of all the evidence."

From the order granting a new trial, plaintiff duly appealed to this court.

By the eighth clause of section 1187, Revised Statutes 1899, street railroad companies of this State are expressly authorized to lease their roads, therefore, the question of power in the United Railways Company (dis-

cussed in the briefs) to execute the lease is eliminated by the statute. The statute conferring the power to lease is silent in regard to the liability of the lessor company for the torts of the lessee company. It neither declares the lessor liable for the torts of its lessee nor exempts it from liability for the negligence of the lessee in the operation of the leased roads; and the many cases cited in the briefs, decided upon express statutes, holding the lessor company liable for the torts of the lessee company, are not in point.

The facts in judgment raised but two questions for decision: the first is, whether or not the contract, denominated a lease, is a lease, in fact, or a mere operating contract under which the Transit Company was operating the United Railways Company's lines of railroad as the agent of the latter company; second, if the contract is found to be a lease, is the defendant liable for the negligence of the lessee in the operation of cars over the leased lines of railroad, in the absence of a statute declaring it shall be so liable. An analysis of the contract of lease shows that by the granting clause the United Railways Company granted, demised and leased to the Transit Company, for a term of forty years, all the railways the lessor then owned, in the city of St. Louis and the county of St. Louis, all that it might thereafter own or construct or operate and all its right, title and interest in all its property, real, personal or mixed, with all its franchises of every sort, reserving, however, its right to continue to be a corporation. All the powers and rights, in regard to collecting tolls, etc., as were possessed by the lessor, were also granted to the Transit Company, subjected, however, to the same legal restrictions as were imposed on the lessor, the Transit Company agreeing to indemnify, save and keep harmless, during the continuance of the lease, the United Railways Company from all costs, charges and expenses arising from the management and operation of said railroads

and all matters incident thereto. As nearly as could be, the contract shod the Transit Company with the shoes of the United Railways Company, the Transit Company assuming all the duties and liabilities of the United Railways Company. By paragraphs one to six inclusive, the Transit Company assumed the payment of all the obligations of the United Railways Company, including all taxes to be assesed against all its property, water rates, etc., and agreed to pay, in addition, as rental, five dollars per share on all the preferred stock of the United Railways Company and one thousand dollars per annum for the purpose of defraying the expenses of maintaining the corporate existence of the United Railways Company. The seventh paragraph requires the lessee to keep the leased property insured against loss by fire and to surrender the property to the lessor in good order at the expiration of the lease. The eighth paragraph requires the lessee to apply surplus earnings, over and above six per cent per annum on twenty million dollars of its capital stock, to the betterment, improvement and extention of the leased railroads or to the redemption of bonds named in the clause. The ninth paragraph provides that the lessor shall turn over all moneys of every character in its possession at the date of the execution of the lease, all that it might thereafter receive during the life of the lease from the sale of any of its property, and obligates the lessee to pay certain liabilities out of such moneys, including accrued interest on the mortgage indebtedness and the improvement of the property. The tenth paragraph provides that the contract shall take immediate effect and states that the United Railways Company is "turning over all assets of every character to Transit Company," and that the latter is "assuming all liabilities of every character of United Railways." The eleventh paragraph provides that the United Railways Company will maintain its corporate existence and exercise its charter rights for the purpose of enabling the

Transit Company to enjoy and avail itself of every right, etc., in respect to the use, management, etc., of the leased property, the Transit Company agreeing to save the United Railways Company harmless against all expense and loss. The twelfth paragraph provides that whenever the Transit Company should fail for sixty days to pay the rent or meet the obligations it assumed, the United Railways Company should have the option to treat the lease as forfeited and take possession of the property, in which event the interest of the Transit Company in and to the property should cease. By the thirteenth paragraph, the United Railways Company agreed to turn over all its cars, machinery, tools and other personal property to the Transit Company, the property turned over to be appraised, and the Transit Company agreed to return it in as good condition as when received, or its equivalent, or to pay the appraised value at the termination of the lease. The fourteenth paragraph is not important to a determination of the question in hand. The fifteenth paragraph required the Transit Company to keep correct books of account of all receipts and disbursements, the books to be open at all times for the inspection of the president of the United Railways Company. The seventeenth and eighteenth paragraphs throw no light on the question before us.

In Edwards v. Noel, 88 Mo. App. l. c. 440, this court approvingly quoted the following definition of a lease: "A lease is a contract for the possession and profits of land and tenements, either for life or a certain term of years, or during the pleasure of the parties." [Bouvier's Law Dictionary.] Substantially the same definition of a lease is given in Thomas v. Railroad, 101 U. S. 71, in Heywood v. Fulmer, 18 L. R. A. 491, and in many other cases that might be cited.

In Moore v. Miller, 8 Pa. St. l. c. 283, it is said: "An agreement that Miller should enter and dig for ore, build houses, etc., he to pay, as a compensation to the

owner of the land, fifty cents a ton for every ton of ore, was, in substance and fact, a lease."

In Walls v. Preston, 25 Calif. 59, it was ruled that an agreement in writing by which one party leased to another, for a specific term, certain land, the second party agreeing to cultivate and plant the land at his own expense and deliver one-sixth of the crops to the first party, was a lease and not a contract for the services of the second party.

In 18 Am. and Eng. Ency. of Law (2 Ed.), sec. 1, p. 597, a lease is defined to be "A contract for the possession and profits of lands and tenements on the one side, and the recompense of rent or property on the other; or, in other words, a conveyance to a person for life, years, or at will, in consideration of a return of rent or other recompense."

The contract comes within the foregoing definition of a lease and, in terms, conveys what the statute, in effect, declares should constitute a lease of a street railroad, to-wit, "the right to hold, use and operate the road." It is contended by the appellant, however, that as the contract shows the United Railways Company agreed to turn over to the Transit Company all its assents, including money on hand and any it might thereafter acquire from any source whatever, with all income derived from any bonds or stocks then owned by it or which it might thereafter acquire, retaining nothing whatever but the bare right to continue to be a corporation, the Transit Company assuming all liabilities of every character of the United Railways Company and agreeing to indemnify and save harmless the United Railways Company against all expense, loss, damage or liability for the exercise of its corporate powers and franchises and the performance of corporate acts when exercised or done at the request of the Transit Company, and that for betterments and improvements to be made by the Transit Company it should be reimbursed by the bonds of the United Rail-

ways Company, the Transit Company became the partner or agent of the United Railways Company. The bonds and stocks the United Railways Company agreed to turn over to the Transit Company are not specifically named, but as the lease shows that the lines of road it acquired had outstanding bonds and stocks which the United Railways Company was expressly authorized to acquire by the seventh clause of section 1187, supra, the reasonable inference is that in making the purchase it acquired stocks and bonds of some or all of these lines of railroad and that it was these stocks and bonds thus acquired that it agreed to turn over to the Transit Company. This inference is strengthened by the further fact that the Transit Company agreed to pay the interest on the bonds of these lines as part payment of the rent reserve, and that these identical lines were leased to it. It is contrary to legislative policy for a corporation to become a member of a partnership (Aurora State Bank v. Oliver, 62 Mo. App. 1. c. 393 and cases cited), and a conclusion should not be drawn that the purpose of the parties to the contract was to form a co-partnership unless the contrary clearly appears.

In Missouri Bottlers' Ass'n v. Fennerty, 81 Mo. App. 1. c. 534, it is said: "The fundamental idea of a partnership *inter sese* is that it is formed for the purpose of trade or gain in business, and that each has the right to participate in the profits."

The contract of lease nowhere shows that the United Railways Company was to participate in the profits to accrue from the operation of the leased property and in no sense of the term did the contract create the relation of partners between the two companies.

As agent has been judicially defined to be "one who undertakes to transact some business, or manage some affair for another, by authority and on account of the latter and to render an account of it." [Wynegar v. State, 157 Ind. 1. c. 579; Metzger v. Huntington, 37 N.

E. 1084.] Paragraphs thirteen and fifteen of the contract are relied on to bring the Transit Company within the definition of an agent. Paragraph thirteen required the Transit Company to turn back all cars, machinery, tools, etc., it received in as good condition as when received or their equivalent, or to pay their appraised value. It is immaterial whether this arrangement is called a lease or a hiring of the equipment and other personal property, the effect is the same. It shows that the Transit Company did not take it to use as the agent of the United Railways Company but to use for its own benefit. The fifteenth paragraph required the Transit Company to keep correct book accounts of all receipts and disbursements to be open at all times for the inspection of the president of the United Railways Company. This paragraph should not be construed separate and apart from the other provisions of the contract, whereby it is shown that the Transit Company agreed to expend the surplus of its net earnings in betterments and improvements or in the purchase of bonds of the acquired lines of railroad. When viewed in connection with this stipulation in the contract it has no meaning other than that the lessor should have the privilege of ascertaining from time to time whether the lessee was expending its surplus earnings in accordance with the provisions of the contract.

Both corporations had a board of ten directors at the time of the trial. Nine members of the board of directors of the United Railways were also members of the board of directors of the Transit Company, and both companies were served by the same president and the same secretary, but whether or not this or a similar condition existed at the time the lease was executed or at the time of the accident is not shown by the evidence, therefore, if any unfavorable inference can be drawn from the fact that both corporations have at the present time a common board of directors and are served by the

same president and the same secretary, the inference cannot be made to relate back to affect the contract of lease, which may have been executed when no such condition existed. Beside, this issue is not in the case, for it is not alleged in the answer, that the two corporations were identical in government and interest, or that the lease was made in bad faith. We do not think there is anything in the contract or the evidence to show that the Transit Company was appointed the mere agent of the United Railways Company. The contract is loaded with many details not usually found in a lease, but the nature of the property leased and the purpose for which it was to be operated, and the many subordinate and varied interests that the Transit Company agreed to protect, made it necessary to either incorporate these details in the contract of lease or to provide for them by a contemporaneous supplemental contract. The fact that they were put in the lease does not destroy the character of that instrument.

2. Having legislative and municipal consent to lease its lines of railroad, is the respondent, nevertheless, liable for damages caused by the negligent operation of cars on the leased lines by its lessee? The authorities on this question are not harmonious.

In Harmon v. Railroad, 28 S. C. 401, the defendant company, under a right given in its charter to "let or farm out," its road to another company, leased its road. The court held that the lease did not exempt the lessor from responsibility, in the absence of any provision granting such exemption, and that it was liable for cattle negligently killed by a train of cars operated by the lessee. Beach, on the authority of this case, says: "The lessor continues to be liable for all acts done by the lessee in operating the road, whether the cause of action be *ex delicto* or *ex contractu*. . . . And this is so although the charter of the former authorizes it to lease

119 App.—40

its road. . . . The original obligation can only be discharged by a legislative enactment, consenting to and authorizing the lease, with an exemption granted to the lessor company." [1 Beach on Private Corporations, sec. 366.] Harmon v. Railroad, supra, followed National Bank v. Railway, 25 S. C. 225, and was in turn followed by Parr v. Railroad, 43 S. C. 197.

In Chicago & Grand Trunk Railway Co. v. Hart, 209 Ill. 414, the rule announced in the South Carolina cases was not only approved but was made to extend to an employee of the lessee company who had been injured by its negligence. The argument in support of the rule is thus stated by the learned judge writing the opinion:

"There is a conflict in adjudicated cases on the question whether a lessor railroad company is liable to a servant of the lessee company for injuries occasioned by the negligence of the lessee company in the operation of the leased road. Mr. Elliott, in his work on Railroads (vol. 2, p. 610), says that he inclines to the opinion that the lessor company is not so liable where the injuries to the servant of the lessee company are caused solely by the negligence of the lessee company in operating the road, but this author says that the weight of authority is against the view that he is inclined to adopt. We think this court is committed to the view held by the current of authorities on the question, and, moreover, that, in sound reason and as the better public policy, the doctrine should be maintained that the lessor company shall be required to answer for the consequences of the negligence of the lessee company in the operation of the road, not only to the public, but also to servants of the lessee company who have been injured by actionable negligence of the lessee company.

"The charter of the lessor company empowered it to construct this line of railroad and operate trains thereon. It became its duty to exercise those chartered powers, otherwise they would become lost by non-user. The

statute authorized it to discharge that duty through a
lessee, and it adopted that means of performing the duty
which the State had created it to perform. The statute
which authorized it to operate its road by means of a les-
see did not, however, purport to relieve it of the obligation
to serve the public by operating the road, nor of any of
the consequences or liabilities which would attach to it
if it operated the road itself. [3 Starr & Cor. Stat. 1896,
p. 3247.] Statutory permission to lease its road does
not relieve a railroad company from the obligations cast
upon it by its charter unless such statute expressly ex-
empts the lessor company therefrom. [Balsley v. St.
Louis, Alton and Terre Haute Railroad Co., 119 Ill. 68.]
While the duty which rests upon the lessor companies
to operate their road is an obligation which they owe to
the public, the permission given by the Legislature, as
the representative of the public, to perform that duty
through lessees, has no effect to absolve such companies
from the duty of seeing that the lessee company provides
and maintains safe engines and cars, and that the em-
ployees of the lessee companies to whom is entrusted the
operation of their roads are competent and that they
perform the duties devolving upon them with ordinary
care and skill, for upon the character and condition of
safety of such engines and cars and on the competency
and care of such employees depend the lives and prop-
erty of the general public."

In Chicago & Western Indiana Railroad Company
v. Doan, 195 Ill. 168, it is said: "The negligence of a
lessee of the tracks of a railroad company is imputable
to the lessor company." The same doctrine is stated in
Chicago & Erie Railroad Company v. Meech, 163 Ill.
305.

In Aycock v. Railroad, 89 N. C. 321, SMITH, C. J.,
for the court, said: "The cases cited in the well-prepared
brief of the plaintiff's counsel fully sustain the proposi-
tion, that the defendant company, leasing the use of its

road or permitting the use of it by another company, remains liable for the consequences of the mismanagement of the train in charge of the servants of the latter, and the injury thence resulting, to the same extent as if such mismanagement was the act or neglect of its own servants operating its own train." This case has been followed and approved in Logan v. Railroad, 116 N. C. 940; Harden v. Railroad, 129 N. C. 354; Smith v. Railroad, 130 N. C. 344, and in Brown v. Railway, 131 N. C. 455.

In Singleton v. Railroad, 70 Ga. 464, the court held:

"The original obligation of the railroad company to the public could not be discharged except by legislative enactment, consenting to and authorizing the lease, with an exemption granted to the lessor company from liability. Legislative consent to the lease is not alone sufficient. There must be a release from the obligations of the company to the public," and further held that the lessor company was liable for injuries to a passenger, caused by the negligence of the lessee company in putting him off the train. At page 467, the court said:

"It is now a well-settled principle that a corporation, being the creature of the law, has only the powers conferred upon it by its charter, and that all others not necessarily implied therefrom are withheld. Its grants, whether of power or exemption, are always to be strictly construed, and its obligations are to be strictly performed, whether they may be due to the State or to individuals. It seems also to be well settled that a railroad corporation (and it is with such that we are dealing in this case) cannot, without special authority of statute, alienate its franchise or property acquired under the right of eminent domain, or essential to the performance of its duty to the public, whether by sale, mortgage or lease. [101 U. S. 71; 17 How. 30; 21 How. 441; 4 Biss. 35; 10 Allen 448.]" This case was followed in Hawkins v. Railway, 119 Ga. 159.

In Braslin v. Railroad, 145 Mass. 64, the defendant had leased its road to another company which lease was subsequently ratified by the Legislature. The plaintiff, while a passenger on a car operated by the lessee company, was thrown from the car and injured. The court held the defendant lessor company liable. In the discussion, ALLEN, J., writing the opinion (at page 68), said:

"The provisions of the lease, including those which are incorporated by reference, define the duties and obligations of the contracting parties as between themselves, and appear to be sufficient effectually to bind the lessee to indemnify the lessor against loss. But it is nowhere stated that the lessor should be exonerated from responsibility, nor was it possible for the parties to make a contract which should have that effect. The sanction of the Legislature was given to the contract as made by the parties, but added nothing by way of exemption from the primary responsibility of the lessor. The lease did not purport to transfer the lessor's franchise, or the whole of its property. The lessor was not going out of business entirely, but only leased a portion of its road, with provisions for restoration of the leased property at the end of the term, and for re-entry. It was under a positive duty and obligation to the public, and the consent of the Legislature to the making of the lease did not imply a discharge from the duty and obligation. Indeed, there is a certain implication that the parties did not contemplate any such discharge, arising from the stipulation for indemnity 'during said term,' that is, during the whole term of the lease.

"Where a corporation seeks to escape from the burdens imposed upon it by the Legislature, clear evidence of a legislative assent to such exoneration should be found."

In Chollette v. Railroad, 4 L. R. A. (Neb.) 135, the court held:

"The original obligation of a railroad company to the public cannot be discharged by a transfer of its franchises to another company, except by legislative enactment consenting to and authorizing such transfer, with an exemption granted to such company relieving it from liability. Legislative consent to the transfer is not alone sufficient; there must be a release from the obligations of the company to the public."

In McCabe's Admx. v. Railroad, 112 Ky. 861, it was held that a provision in the charter of a railroad corporation empowering the corporation to "make contracts with individuals, corporations and other railroad companies for the building, completion and operating of said road or any part thereof," authorized the corporation to lease its road, but did not relieve it from liability for the negligence of the lessee in the operation of a train whereby a person on the track was struck and killed.

In Heron v. Railway, 68 Minn. 542, it was ruled that exemption from liability on the part of the lessor company for damages for acts of the lessee company is not necessarily implied from a lease made with legislative authority, giving the lessee company exclusive control and possession of the road.

McCoy v. Railway, 36 Mo. App. 445, cited by appellant, where the lessor company was held liable for damages caused by fire escaping from the engine of the lessee company, is not in point, for the reason the statute authorizing the lease expressly reserved that the lessor should not escape any of the responsibility it owed to the public. Neither is the case of Anderson v. Railroad, 161 Mo. 411, 61 S. W. 874, cited by appellant, in point, nor any other Missouri case cited by counsel for either side.

As stated in 23 Am. and Eng. Ency. of Law (2 Ed.), p. 784, "there is a sharp conflict of authority as to whether the lessor of a railroad is liable for injuries to personal property caused by the wrongful or negligent

acts or omissions of the lessee in the operation of the road, as distinguished from the non-performance of a duty which the lessor's charter or the general law imposes primarily on the lessor."

Judge Elliott, in his work on Railroads, after noticing the conflict of authority, says: "Our opinion is that where the lease is executed under the provisions of a statute, in accordance with its requirements, is made to a company having authority to accept it, and is made in good faith and not for the purpose of transferring duties or obligations to an irresponsible party, the lessor company is not liable for injuries caused by the negligence of the lessee and not attributable to a breach of any public duty of the company that executed the lease." [2 Elliott on Railroads, sec. 469.]

Nellis on Street R. R. Accident Law, p. 488, without referring to the conflict of authority or commenting on any of the cases, says: "Where the railroad company is authorized by law to lease its road to another railroad company, the company leasing its road is not liable for the misconduct in the management, if the persons in charge at the time are not in fact its servants or agents, but are the servants or agents of the lessee."

Hutchinson on Carriers (2 Ed.), sec. 515b, says: "An authorized lease, however, not otherwise providing, will absolve the lessor from the torts of the lessee resulting from the negligent operation and handling of its trains and the general management of the leased road over which the lessor has no control;" citing Nugent v. Railroad, 80 Me. 62, and Mahoney v. Railroad, 63 Me. 68, as authority for this rule. But no reference is made in the note by the author to cases holding to the contrary.

On the authority of the Maine and New York cases, Pierce says: "The lease of a railroad under due authority of law effects a transfer of rights and liabilities in its management, so that the corporation owning the rail-

road is discharged from responsibility for the lessee's torts." [Pierce on Railroads, sec. 283.] Pattison, on the authority of the Maine and New York cases states the same doctrine. [Pattison on Railway Accident Law, sec. 131.]

Wood on Railroads, vol. 3, p. 2056, says: "Where the lease is made under due authority, so that there can be no objection to its validity, some authorities hold that the lessor is relieved from liability for injuries resulting from the negligent operation of the road. But this admits of serious question unless the lease contains specific provision for the lessor's exemption from liability." In a footnote the author cites some of the conflicting cases but refrains from an expression of individual opinion in regard to the rule.

In Arrowsmith v. Railroad, 57 Fed. 165, most of the authorities are reviewed by Judge LURTON and the conclusion reached is, that where a railroad company leases its line by authority of law, and there is no exemption from future liability, either by express terms of the statute or the terms of the lease, nevertheless the lessor is not liable for injuries to a passenger traveling under a contract with the lessee, when such injuries are caused wholly by the lessee's negligence in operating the road. This case was followed in Hayes v. Northern Pacific R. R. Co., 74 Fed. Rep. 279.

In Ditchett v. Railroad, 67 N. Y. 425, it was held that a recovery could not be had by a plaintiff, suing as administrator for injuries caused his intestate by falling into a cut made by the defendant for the purpose of its railway, said cut having been made by the lessor and inclosed by a substantial fence before the making of the lease, which fence was permitted to become out of repair by the lessee corporation: The court applied to the case the ordinary rule, that a lessor of premises who parts with them while they are in proper condition is not bound to see that they are thereafter properly cared for

by his lessee and is not responsible for their subsequent condition. The same ruling was applied by the same court in Miller v. Railroad, 125 N. Y. 118.

In Caruthers v. Railroad, 54 Pac. (Kan.) 673, it was held: "In the case of a lease made by one railroad company to another under the statute authorizing leases between railroad companies, the lessor company is not liable to third persons for injuries resulting from the negligent operation of the leased line by the lessee company, where the lease is general in its terms, and confers upon the lessee company 'the exclusive right to run and operate its trains of cars over and upon the track of the lessor company,' without reserving to the latter any right of control over the operation of the road by the former."

In Pinkerton v. Pennylvania Traction Co., 44 Atl. (Pa.) 284, it was ruled that where a lease of a street railway is duly authorized by law, the lessee only is liable for negligence in its operation.

In Buckner v. Railroad, 18 South. (Miss.) 449, and in Virginia M. Ry. Co. v. Washington, 10 S. E. (Va.) 927, it was held that the lessor company was not liable for injuries caused by the negligence of the lessee company to its employees in the operation of the road.

The authority of the case of Nelson v. Railroad, 26 Vt. 717, holding the lessor liable for the negligence of the lessee in the operation of a train over the leased road, is somewhat shaken by Judge REDFIELD, in a note to paragraph 3 (vol. 1, p. 636) in his work on Railways. The paragraph reads as follows:

"But even where such contracts have been made, by permission of the Legislature, it has been held, in this country, that the company leasing itself does not thereby escape all responsibility to the public; but that the public generally may still look to the original company, as to all its obligations and duties, which grow out of its relations to the public, and are created by charter and

the general laws of the State, and are independent of contract or privity between the party injured and the railway." In a footnote he refers to the Nelson case and says: "But it is, perhaps, worthy of consideration, in regard to this case, that the effect of the legislative consent to the lease is not made a point in this case."

The courts of all the States, except New York, so far as we have been able to see, have held that a railroad company is not absolved from its public or statutory obligations by leasing its road to another company, though authorized by the Legislature to execute the lease, unless the statute authorizing it to lease grants the exemption. A street railroad corporation is a *quasi* public corporation, enjoying a monopoly and is created for the primary and almost exclusive purpose of carrying passengers, and the acceptance of its charter implies an assumption on its part of an obligation in favor of the public to operate its road until discharged from the obligation by the State, hence its duty to carry passengers is a public one. [State v. Railroad, 29 Conn. 538; 1 Morawetz on Private Corporations, sec. 116.] A distinction has been drawn between the common-law obligation of a railroad company to carry freight and passengers and its statutory obligation to fence its road, build cattle-guards at public highway crossings, prevent sparks from escaping from its engines and setting out fire on the land of adjoining proprietors, and other like statutory requirements. The statutory duties are denominated public ones, from a performance of which a lessor company is not absolved unless the exemption is granted by the Legislature, while the obligation to carry passengers is generally called a private duty arising out of contract. It seems to me this distinction is more subtle than sound. The duty to fence, etc., is imposed by statute. The obligation to carry passengers is grounded in the common law. Both duties are legal and the company assumes to discharge both by the acceptance of its charter, and I cannot see

on what rational ground one is classed as a public and the other as a private duty. They are of equal dignity, of equal force and the performance of either may be enforced by the State in a proceeding by mandamus (State v. Railroad, supra) and it is only true in a relative sense that a passenger is received and carried by a railroad company by virtue of a private contract made by him with the company. By incorporating under the general laws of the State, the defendant agreed to carry passengers for a fare to be fixed by the Municipal Assembly of the city of St. Louis (sec. 1187, supra). It also agreed to submit to and observe such reasonable municipal regulations in regard to stopping its cars for receiving and discharging passengers as the Municipal Assembly of the city might prescribe by ordinance. The fare has been fixed by ordinance, and police regulations, in regard to the operation of its cars, and the reception and discharge of passengers, have been enacted; so that the State and the city on the one side, for the benefit of the public, have fixed the fare to be paid, designated the places on the streets where passengers shall be received and discharged, and the company on the other, by incorporating under the general laws, agreed to the terms prescribed by the State and city, and all that is required of the individual to become a passenger is to accept the terms of the contract exacted of the company by the State and city for his benefit, and when he presents himself for carriage at the proper time and place and tenders the fare fixed, the company is bound to receive and carry him; to refuse to do so would be a repudiation of the very purpose of its charter and a violation of the highest of its obligations to the public. The following clause in the lease, to-wit: "And Transit Company will indemnify, save and keep harmless, during the continuance of this lease, United Railways from all costs, charges and expenses arising from the management and operation of said railways, and all matters incident

thereto," indicates that defendant, United Railways Company recognized that one of its public duties was to carry passengers, and took from the Transit Company an obligation to indemnify and save it harmless for all costs and damages that might accrue from the negligent performance of the duty by its lessee. It exacted of the Transit Company an exemption from its obligation to transport passengers in safety—an exemption the Legislature withheld when granting the power to lease. But it seems to me that whether the obligation of a street railroad company to carry passengers is classed as an obligation the company peculiarly owes to the public, and for that reason cannot be shifted to a lessee without legislative grant, or as a mere private obligation to the individual passenger, arising out of contract, expressed or implied, the obligation is so far-reaching and of such paramount importance to urban populations that exemption from the obligation cannot be had in any other way than by express legislative grant. The defendant has not received this grant, and I think it would best conserve the legislative policy of the State to follow the rule as declared by the cases cited from the States of Massachusetts, Vermont, Illinois, Kentucky, Georgia, North and South Carolina, and hold the defendant liable for injuries caused by the negligent operation of its cars by the Transit Company, its lessee.

The foregoing statement and opinion were written and in the hands of the other members of the court for months before their opinions were prepared, and in view of the fact that they have discussed questions not noticed in my opinions, I deem it proper to add my individual views touching these questions, and proceed to do so.

The argument of my learned associates, to the effect that the Legislature, by using the term "lease," in sections 1187, Revised Statutes 1899, without restricting or qualifying its ordinary meaning, intended the lease

therein authorized should, as to the public and as to third persons, in respect to the management and use of the leased property, stand on the same footing and be governed by the same rules of law as a lease between private persons, it seems to me is strained and wholly unsound. A private person acquires property for his sole use and when acquired it is wholly his own and he may do as he will with it, provided he does no legal wrong in his use or disposition of it. This is not so in respect to a street railway company. It procures a franchise to lay its tracks in the public streets of a city, with the distinct understanding that it will provide the necessary rolling stock and equipment to carry the traveling public. Property thus acquired is not for the sole use of the company, but is also for the use of the public, and the public has an interest in it, and hence is directly interested in its management and operation (Muntz v. Railway, 64 L. R. A. 222) and is, in no narrower sense, a party in interest to every contract affecting the use and management of the property; and the rules of law defining the several duties and obligations of the lessor and lessee of private property are wholly inadequate to protect the interests of the public in street railway property operated under a lease, and it seems to me, on grounds of public policy, that the lessor company should be held to a strict performance of the duties imposed upon it by law, chief among which, is to carry passengers safely. I also find in both opinions an argument, or rather an inference, which I think is unsound and not warranted by any language found in the statute. It is this, that the section (1187) evinces a legislative intent that the public policy of the statute shall be to exempt the lessor company from liability for injuries to passengers, caused by the negligence of the lessee.

SHERWOOD, J., in Kitchen v. Greenabaum, 61 Mo. l. c. 115, said: "Courts have never yet ventured to de-

line in specific terms the meaning of the phrase, 'public policy,'"

In Enders v. Enders, 164 Pa. St. 1. c. 271, the court said: "Public policy, in the administration of the law by the courts, is essentially different from what may be public policy in the view of the Legislature. With the Legislature, it may be, and often is, nothing more than expediency."

In People v. Hawkins, 51 N. E. 1. c. 260, it is said by the New York Court of Appeals: "The courts have often found it necessary to define its (public policy) judicial meaning, and have held that a State can have no public policy except what is to be found in its Constitution and laws."

In Swann v. Swann, 21 Fed. 1. c. 301, it is said: "The only authentic and admissible evidence of the public policy of a State on any given subject are its Constitution, laws, and judicial decisions." A like ruling was made in Hartford Fire Ins. Co. v. Railway, 70 Fed. 201.

Prior to 1899, when section 1187 was passed, on grounds of public policy, street railroad companies were denied the power to lease their roads. By the act of 1899, the Legislature abrogated this public policy and declared a different policy by granting them the power to lease. To this extent the statute is declaratory of the public policy of the State respecting the right of street railroad companies to lease their property. The statute is absolutely silent as to whether or not a lease shall or shall not exempt the lessor company from liability for failure to perform the statutory duties required of all street railroad companies, or from liabilty for injuries to a passenger caused by the negligence of the lessee; and I am unable to see upon what rational ground it can be said, the Legislature by granting the power to lease, also by its silence, declared a public policy that should follow the exercise of the power, when the policy is in nowise connected with or essential to a full and complete ex-

crcise of the power granted. In case of an absolute sale of the property and franchise of a street railway company, no question of liability of the selling company can arise. But a lease is not a sale. In the lease contract, the United Railways Company expressly reserved its right to be a corporation, maintained ownership in all its property, personal and real, held on to its charter, to its franchises and privileges, and the question is, can it do this and at the same time shift all liability for the non or malperformance of the duties it contracted to perform as a consideration for the grant of its franchise by the State, by merely delegating to another company, under the form of a lease, authority to possess, manage and operate its road. If the Legislature, with the power of a lease, had also granted the exemption, it would have declared what should be the future public policy of the State respecting the question under consideration. As it did not do this, the question is one to be answered by the courts, not on anything that is found in the statute, for that is absolutely silent, but by the general tenor of legislation respecting these public-service corporations, and the decisions of the Supreme Court, from both of which it is manifest that the public policy of the State is, and always has been, to hold railroad companies, both steam and street, to a strict accountability for the manner in which they manage and operate their roads and to exact from them the exercise of the very highest degree of care for the safety of their passengers. If this rule of public policy is adhered to, it seems to me that nothing short of a legislative grant of exemption will be effectual to shift liability from the lessor to the lessee company for an injury to a passenger caused by the negligence of the lessee. Entertaining these views, I am unable to concur in the reasoning or result reached by my learned associates; and from the discussion in the case of Markey v. Railroad, 185 Mo. 348, 84 S. W. 61, I think the opinions of the majority are opposed to the

views of the Supreme Court in the Markey case, and therefore ask that the case be certified to the Supreme Court for final decision.